IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

CASE NO. 12-4004

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

JAMES C. DIMORA,
Defendant-Appellant.

On Appeal from the United States District Court
for the Northern District of Ohio
Eastern Division

BRIEF OF PLAINTIFF-APPELLEE

Christian J. Grostic
Kushner & Hamed Co., L.P.A.
One Cleveland Center
1375 Public Square, Suite 1930
Cleveland, Ohio 44114
Telephone No: (216) 696-6700
Facsimile: (216) 696-6772
cgrostic@khlpa.com

Counsel for Defendant-Appellant

Eric H. Holder, Jr.
Attorney General of the United States

Barbara L. McQuade
United States Attorney
Eastern District of Michigan

Laura McMullen Ford
Antoinette T. Bacon
Ann C. Rowland
Assistant United States Attorneys
801 West Superior Avenue, Suite 400
Cleveland, Ohio 44113
Telephone: (216) 622-3817/3966/3847
Facsimile: (216) 522-7358/2343
Laura.Ford@usdoj.gov
Antoinette.T.Bacon@usdoj.gov
Ann.Rowland@usdoj.gov

Counsel for Plaintiff-Appellee

i

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

STATEMENT REGARDING ORAL ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . x

JURISDICTIONAL STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF THE FACTS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

SUMMARY OF THE ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

I.      THE DISTRICT COURT CORRECTLY REQUIRED DIMORA TO
        INTRODUCE INTO EVIDENCE HIS STATE ETHICS REPORTS
        THROUGH A COMPETENT WITNESS TO TESTIFY ABOUT THE
        REPORTS' CONTENTS, WHERE DIMORA'S DISCLOSURES ABOUT
        UNSPECIFIED GIFTS AND MEALS HE RECEIVED OTHERWISE
        CONSTITUTED IRRELEVANT HEARSAY.. . . . . . . . . . . . . . . . . . . . . . 26

II.     THE DISTRICT COURT CORRECTLY EXCLUDED DIMORA'S
        REVERSE RULE 404(b) EVIDENCE, WHERE IT WOULD NOT
        NEGATE HIS CRIMINAL INTENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

III.    THE JURY INSTRUCTIONS CORRECTLY REFLECTED APPLICABLE
        LAW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

IV.     SUFFICIENT EVIDENCE SUPPORTS DIMORA'S CONVICTIONS ON
        COUNTS 9 AND 11-13 FOR HOBBS ACT CONSPIRACY,
        SUBSTANTIVE HOBBS ACT OFFENSES AND CONSPIRACY TO
        COMMIT MAIL FRAUD AND HONEST SERVICES MAIL FRAUD. . 71

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

ii

CERTIFICATION OF COMPLIANCE WITH WORD LIMITATION.. . . . . . . . 84

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS. . . . . . . 86

iii

## <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>                                                    <u>PAGE(S)</u>

<u>Anderson v. United States</u>, 417 U.S. 211 (1974). . . . . . . . . . . . . . . . . . . . . . . 60, 74

<u>Baze v. Parker</u>, 371 F.3d 310 (6th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . 28

<u>Callanan v. United States</u>, 881 F.2d 229 (6th Cir. 1989). . . . . . . . . . . . . . . . . . 45

<u>Chambers v. Mississippi</u>, 410 U.S. 284 (1973). . . . . . . . . . . . . . . . . . . . . . . . . 28

<u>Crane v. Kentucky</u>, 476 U.S. 683 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

<u>Evans v. United States</u>, 504 U.S. 255 (1992). . . . . . . . . . . . . . . . . . . . . . . . 72, 77

<u>Herzog v. United States</u>, 226 F.2d 561 (9th Cir. 1955). . . . . . . . . . . . . . . . . . . 50

<u>Jackson v. Norris</u>, 651 F.3d 923 (8th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . 28

<u>Jackson v. Virginia</u>, 443 U.S. 307 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

<u>McCullough v. Stegall</u>, 2001 WL 966282 (6th Cir. 2001) (unpublished). . . . . . . 29

<u>Montana v. Egelhoff</u>, 518 U.S. 37 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

<u>Morgan v. Krenke</u>, 232 F.3d 562 (7th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . 28

<u>Taylor v. Illinois</u>, 484 U.S. 400 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

<u>United States v. Abbey</u>, 560 F.3d 513 (6th Cir. 2009). . . 24, 59, 63, 65, 66, 72, 73, 77

<u>United States v. Abboud</u>, 438 F.3d 554 (6th Cir. 2006). . . . . . . . . . . . . . . . . . . . 71

<u>United States v. Ashraf</u>, 628 F.3d 813 (6th Cir. 2011). . . . . . . . . . . . . . . . . . . . . 26

<u>United States v. Benedetto</u>, 571 F.2d 1246 (2d Cir. 1978). . . . . . . . . . . . . . . . . . 49

iv

United States v. Biaggi, 909 F.2d 662 (2d Cir. 1990). . . . . . . . . . . . . . . . . . . 61, 69

United States v. Bibby, 752 F.2d 1116 (6th Cir. 1985). . . . . . . . . . . . . . . . . . . 67

United States v. Birdsall, 233 U.S. 223 (1914).. . . . . . . . . . . . . . . . . . . . 24, 69, 70

United States v. Blackwell, 459 F.3d 739 (6th Cir. 2006). . . . . . . . . . . . . . . 41, 71

United States v. Boyd, 640 F.3d 657 (6th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . 26

United States v. Carter, 530 F.3d 565 (7th Cir. 2008). . . . . . . . . . . . . . . . . . . . . 67

United States v. Clark, 2010 WL 1924710 (6th Cir. 2010) (unpublished). . . 48, 56

United States v. Clay, 667 F.3d 689 (6th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . 48

United States v. Collins, 78 F.3d 1021 (6th Cir. 1996). . . . . . . . . . . . . . . . . . . . 67

United States v. Coyne, 4 F.3d 100 (2d Cir. 1993).. . . . . . . . . . . . . . . . . . . . . . . 61

United States v. Daulton, 2008 WL 116356 (6th Cir. 2008) (unpublished). . 48-51, 55, 56

United States v. DeSantis, 134 F.3d 760 (6th Cir. 1998). . . . . . . . . . . . . . . . . . 41

United States v. Dobbs, 506 F.2d 445 (5th Cir. 1975). . . . . . . . . . . . . . . . . . . . . 50

United States v. Ediger, 2006 WL 328010 (6th Cir. 2006) (unpublished).. . . . . 41

United States v. Ellisor, 522 F.3d 1255 (11th Cir. 2008). . . . . . . . . . . . . . . . . . 50

United States v. Farley, 2 F.3d 645 (6th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . 67

United States v. Frederick, 406 F.3d 754 (6th Cir. 2005).. . . . . . . . . . . . . . . . . 58

United States v. Freeman, 6 F.3d 586 (9th Cir. 1993). . . . . . . . . . . . . . . . . . . . . 69

v

United States v. Frost, 125 F.3d 346 (6th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . 80

United States v. Garcia, 992 F.2d 409 (6th Cir. 1993). . . . . . . . . . . . . . . . . . . . . 61

United States v. Graham, 622 F.3d 445 (6th Cir. 2010). . . . . . . . . . . . . . . . . 71, 72

United States v. Harding, 563 F.2d 299 (6th Cir. 1977). . . . . . . . . . . . . . . . . . . . 68

United States v. Hardy, 586 F.3d 1040 (6th Cir. 2009). . . . . . . . . . . . . . . . . . . . . 41

United States v. Hatchett, 918 F.2d 631 (6th Cir. 1990). . . . . . . . . . . . . . . . 30, 31

United States v. Hayes, 219 Fed. Appx. 114 (3d Cir. 2007) (unpublished). . . . . . 55

United States v. Holzer, 816 F.2d 304 (7th Cir.), vacated and remanded, 484 U.S. 807 (1978), in light of McNally v. United States, 483 U.S. 350 (1987). . . . . . . . 68

United States v. Horton, 847 F.2d 313 (6th Cir. 1988). . . . . . . . . . . . . . . . . . . . . 58

United States v. Hughes, 505 F.3d 578 (6th Cir. 2007). . . . . . . . . . . . . . . . . . . . . 72

United States v. Humphrey, 279 F.3d 372 (6th Cir. 2002). . . . . . . . . . . . . . . . . . . 71

United States v. Jackson-Randolph, 282 F.3d 639 (6th Cir. 2002). . . . . . . . . . . . 48

United States v. James, 2012 WL 3608612 (6th Cir. 2012) (unpublished). . . . . . 48

United States v. Jefferson, 674 F.3d 332 (4th Cir.), cert. denied, 133 S. Ct. 648 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69, 77

United States v. Jennings, 160 F.3d 1006 (4th Cir. 1998). . . . . . . . . . . . 60, 73, 76

United States v. Jones, 647 F.2d 696 (6th Cir. 1981). . . . . . . . . . . . . . . . . . . . . . 63

United States v. Kuehne, 547 F.3d 667 (6th Cir. 2008). . . . . . . . . . . . . . . . . . . . 58

United States v. Loftus, 992 F.2d 793 (8th Cir. 1993). . . . . . . . . . . . . . . . . . 68, 82

vi

United States v. Mack, 258 F.3d 548 (6th Cir. 2001). . . . . . . . . . . . . . . . 48, 58, 62

United States v. McAuliffe, 490 F.3d 526 (6th Cir. 2007). . . . . . . . . . . . . . . . . . 72

United States v. McDaniel, 398 F.3d 540 (6th Cir. 2005). . . . . . . . . . . . . . . . . . 26

United States v. McNair, 605 F.3d 1152 (11th Cir. 2010). . . . . . . . . . . . . . . . . . 66

United States v. Morlang, 531 F.2d 183 (4th Cir. 1975). . . . . . . . . . . . . . . . . . . 69

United States v. Muntain, 610 F.2d 964 (D.C. Cir. 1979). . . . . . . . . . . . . . . . . . 66

United States v. Nedza, 880 F.2d 896 (7th Cir. 1989). . . . . . . . . . . . . . . . . . . . . 68

United States v. Peters, 15 F.3d 540 (6th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . 71

United States v. Prince, 214 F.3d 740 (6th Cir. 2000). . . . . . . . . . . . . . . . . . . . . 71

United States v. Prince-Oyibo, 320 F.3d 494 (4th Cir. 2003). . . . . . . . . . . . . . . 28

United States v. Qaoud, 777 F.2d 1105 (6th Cir. 1985). . . . . . . . . . . . . . . . . . . . 49

United States v. Rabbitt, 583 F.2d 1014 (8th Cir. 1978). . . . . . . . . . . . . . . . 68, 69

United States v. Rivera Rangel, 396 F.3d 476 (1st Cir. 2005). . . . . . . . . . . . . . . 67

United States v. Russell, 595 F.3d 633 (6th Cir. 2010). . . . . . . . . . . . . . . . . . . . 58

United States v. Sawyer, 85 F.3d 713 (1st Cir. 1996). . . . . . . . . . . . . . . . . . . . . 61

United States v. Scarpa, 897 F.2d 63 (2d Cir. 1990). . . . . . . . . . . . . . . . . . . . . . 50

United States v. Silber, 2012 WL 171397 (6th Cir. 2012) (unpublished). . . . . . . 56

United States v. Stephens, 964 F.2d 424 (5th Cir. 1992). . . . . . . . . . . . . . . . . . . 68

United States v. Sun-Diamond Growers of California, 526 U.S. 398 (1999). . . 65, 69

vii

United States v. Tasis, 696 F.3d 623 (6th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . 49

United States v. Terry, 707 F.3d 607 (6th Cir. 2013). . . . . 23, 59, 60, 64, 65, 73, 76

United States v. Urciuoli, 513 F.3d 290 (1st Cir. 2008). . . . . . . . . . . . . . . 66, 67, 77

United States v. Vazquez-Botet, 532 F.3d 37 (1st Cir. 2008). . . . . . . . . . . . . . . 28

United States v. Villarce, 323 F.3d 435 (6th Cir. 2003). . . . . . . . . . . . . . . . . . . . 72

United States v. White, 663 F.3d 1207 (11th Cir. 2011). . . . . . . . . . . . . . . . . . . 43

United States v. Whitfield, 590 F.3d 325 (4th Cir. 2009).. . . . . . . . . . . . . . . 60, 73

United States v. Williams, 612 F.3d 500 (6th Cir. 2010). . . . . . . . . . . . . . . . . . . 58

United States v. Williams, 952 F.2d 1504 (6th Cir. 1991). . . . . . . . . . . . . . . . . . 62

United States v. Woodward, 149 F.3d 46 (1st Cir. 1998).. . . . . . . . . . . . . . . 60, 74

## **FEDERAL RULES**

Fed. R. Evid. 401. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Fed. R. Evid. 401(a).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Fed. R. Evid. 402. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Fed. R. Evid. 403. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37, 39, 56

Fed. R. Evid. 404(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 35, 48, 51

Fed. R. Evid. 405. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Fed. R. Evid. 801(a).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Fed. R. Evid. 801(c).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

viii

Fed. R. Evid. 803(6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Fed. R. Evid. 803(6)(E). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

## **FEDERAL STATUTES**

18 U.S.C. § 2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 201. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66, 69

18 U.S.C. § 201(c)(1)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

18 U.S.C. § 371. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 666. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 43, 65, 66

18 U.S.C. § 666(a)(1)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 1341. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 1343. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 1346. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 1349. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 1512. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 1519. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 1951. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 1962(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 3231. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

26 U.S.C. § 7206(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ix

28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

x

## **STATEMENT REGARDING ORAL ARGUMENT**

Plaintiff-appellee, the United States of America, agrees with

defendant-appellant, James C. Dimora, that the decisional process would be

significantly aided by oral argument.

1

## <u>JURISDICTIONAL STATEMENT</u>

The district court derived jurisdiction under 18 U.S.C. § 3231. (R. 1: Indictment, PageID 1). The district court entered judgment against defendant-appellant, James Dimora, on August 1, 2012. (R. 957: Judgment, PageID 19979). Dimora filed his timely notice of appeal on August 13, 2012. (R. 967: Notice of Appeal, PageID 20035). This Court reviews the final disposition of a district court case under 28 U.S.C. § 1291.

2

## STATEMENT OF THE ISSUES

I.  Whether the district court correctly required Dimora to introduce into
evidence his state ethics reports through a competent witness to
testify about the reports' contents, where Dimora's disclosures about
unspecified gifts and meals he received otherwise constituted
irrelevant hearsay?

II.  Whether the district court correctly excluded Dimora's reverse Rule 404(b)
evidence, where it would not negate his criminal intent?

III.  Whether the jury instructions correctly reflected applicable law?

IV.  Whether sufficient evidence supports Dimora's convictions on Counts 9 and
11-13 for Hobbs Act conspiracy, substantive Hobbs Act offenses and
conspiracy to commit mail fraud and honest services mail fraud?

3

## STATEMENT OF THE CASE

On September 7, 2011, a federal grand jury, in the Northern District of Ohio, returned a third superseding indictment against Dimora charging: RICO conspiracy under 18 U.S.C. § 1962(d); conspiracy to commit mail fraud and honest services mail fraud under 18 U.S.C. §§ 1341, 1346 and 1349; mail fraud under Section 1341; conspiracy to commit wire fraud and honest services wire fraud under 18 U.S.C. §§ 1343, 1346 and 1349; Hobbs Act conspiracy and Hobbs Act offenses under 18 U.S.C. § 1951; conspiracy to commit bribery concerning programs receiving federal funds under 18 U.S.C. § 371, bribery concerning programs receiving federal funds under 18 U.S.C. §§ 666(a)(1)(B) and 2; conspiracy to obstruct justice under 18 U.S.C. §§ 371 and 1512; obstructing a federal investigation under 18 U.S.C. §§ 1519 and 2; and making false statements on tax returns under 26 U.S.C. § 7206(1). (R. 444: Third Superseding Indictment, PageID 9630). A jury trial commenced before United States District Judge Sara Lioi on January 12, 2012.

On March 9, 2012, the jury returned guilty verdicts against Dimora on all but Count 30. (R. 738: Verdict, PageID 17116). The court granted a judgment of acquittal on Count 10. (R. 930: Opinion, PageID 18881).

4

The court sentenced Dimora to an aggregate of 336 months imprisonment, including concurrent 240-month sentences on Counts 1, 3, 7-9, 11-16, 20-27 and 29; concurrent 60-month sentences on Counts 4 and 17, a consecutive 60-month sentence on Count 28; concurrent 120-month sentences on Count 5-6, 18 and 19; and concurrent 26-month sentences on Counts 34-37.  (R. 957: Judgment, PageID 19981).  The court entered judgment on August 1, 2012.  (Id., PageID 19979).  Dimora filed his notice of appeal on August 13, 2012.  (R. 967: Notice of Appeal, PageID 20034).

5

## <u>STATEMENT OF THE FACTS</u>

In 2007, the FBI "launched a large scale [public corruption] probe" in Cuyahoga County, "result[ing] in . . . numerous . . . convictions." (R. 1000: Sentencing Tr., PageID 20616). Former Cuyahoga County Commissioner, James Dimora, was one of many public officials convicted of participating in systemic, pervasive local government corruption. (<u>Id.</u>, PageID 20626).

While serving as County Commissioner for a decade, (R. 1000: Sentencing Tr., PageID 20621), Dimora "work[ed] in tandem" with former Cuyahoga County Auditor Frank Russo. (<u>Id.</u>, PageID 20625). Testimony established that Dimora sold public jobs, tried to fix court cases, steered County funding and otherwise used his power to give bribe payors an unfair advantage over others. (<u>See, e.g.</u>, R. 1017: Gallagher, Trial Tr., PageID 24278-79, 24282-301; R. 1013: Massie, Trial Tr., PageID 23222-23; R. 1019: Massie, Trial Tr., PageID 24753-54, 24757-74, 24779-827; R. 1034: Pumper, Trial Tr., PageID 27742, 27859-72; R. 1014: Kleem, Trial Tr., PageID 23400-04, 07; R. 1039: Russo, Trial Tr., PageID 28931-36, 29036-38; R. 1040: Russo, Trial Tr., PageID 29118-19). In return, Dimora received approximately 100 bribes totaling more than $250,000. (PSR, pp. 22-33).

6

The district court described "the breadth and depth of the corruption of the County government in which Mr. Dimora and Mr. Russo and others [we]re entrenched [a]s staggering and the destruction in its wake incalculable [sic]," (R. 1000: Sentencing Tr., PageID 20626), citing Dimora's receipt of "lavish" "meals, home improvements, gambling trips, services of prostitutes, and . . . cash" in return for his influence. (<u>Id.</u>, PageID 20622-23). Recognizing that "[t]he reach of his corruption was far and wide. . . . [by] caus[ing] the businessmen who became involved in the schemes to lose their livelihoods and their liberty. . . . [and] prevent[ing] others from having any opportunity to play on a level playing field," the court concluded that "this is exactly the type of conduct that undermines the public's confidence in their government." (<u>Id.</u>, PageID 20621).

Dimora's appeal centers on four of fifteen bribery schemes of which he was convicted. Dimora's crimes fell within four categories: bribery, fraud, obstruction and tax; the latter resulting from his failure to report the bribes as income on his tax returns. (R. 1042: Fatula, Trial Tr., PageID 29668-73, 29702). Russo and other participants in eleven of fifteen bribery schemes testified about the conspiracies and the "quids" and "quos" of those schemes. Title III recordings corroborated that testimony, including some in which the parties discussed the "quid" and the "quo" in the same call. (<u>See, e.g.</u>, Gov't Exs. 400-N, 809).

7

Dimora argued that what the government characterized as "bribes," were "gifts" from friends. (R. 1045: Trial Tr., PageID 30278, 30309, 30331, 30348-51, 30361, 30374-77, 30384). The jury instructions defined "gifts" and "bribes" and stated that, "[f]or tax purposes, a gift proceeds from a detached and disinterested generosity arising from affection, respect, admiration, charity or like impulses." (R. 1044: Trial Tr., PageID 30111). The court explained that "[t]he most critical consideration is the transferor's or donor's intention. What controls is the intention with which the payment was made." (Id.). The court also instructed that "[a] payment is not a gift if the person making the payment did not act from any sense of generosity, but rather to secure goods, services, or some other such benefit for himself or for another." (Id., PageID 30112).

The government's evidence of Dimora's *quid pro quo* intent included Russo's testimony, bribe payors' testimony, intercepted conversations, Dimora's obstruction, timing of bribes and official acts, methods of funneling bribes and Dimora's secrecy. Nine cooperating witnesses pleaded guilty and testified they bribed Dimora. (See, e.g., R. 1014: Kleem, Trial Tr., PageID 23320-23, 23328-29, 23335-55, 23360, 23365, 23439, 23399, 23407; R. 1015: Kleem, Trial Tr., PageID 23707, 23709; R. 1017: Gallagher, Trial Tr., PageID 24278-95, 24310; R. 1022, Kelley, Trial Tr., PageID 25395-96; R. 1024: Kelley, Trial Tr., PageID 25840-53,

8

25859-60, 25879-80; R. 1027: Kelly, Trial Tr., PageID 26490-91, 26636-38;

R.1016: Schuman, Trial Tr., PageID 24043, 24052-55, 24061-62; R. 1034:

Pumper, Trial Tr., PageID 27741-44, 27747-48; R. 1035: Pumper, Trial Tr.,

PageID 27888-94; R. 1036: Zavarella, Trial Tr., PageID 28300-10; R. 1037:

Zavarella, Trial Tr., PageID 28331; R. 1036: Valentin, Trial Tr., PageID 28219,

28221-28, 28232-38, 28242; R. 1038: Randazzo, Trial Tr., PageID 28816-17; see

also R. 1039: Russo, Trial Tr., PageID 28901-08, 28917-52, 29048-51).

Russo testified that he and Dimora accepted multiple bribes, describing how

the scheme began with "sponsors" hosting dinner parties, (R. 1039: Russo, Trial

Tr., PageID 28901-08, 28917-52, 29048-51, 29116-17), and continued to "grow

and grow," with no plans to stop before the criminal investigation.  (R. 1040:

Russo, Trial Tr., PageID 29116).  For example, on the Stonebridge scheme (Count

8), Russo testified that Kevin Payne, and at times Kevin Kelley, gave Dimora

cash, limousine service, prostitutes, access to a luxury Stonebridge condominium

and meals in return for a new lease for the County Engineer's Office and budget

allocations.  (Id., PageID 28930-56).  Kelley, who similarly testified that the

Stonebridge scheme included Payne providing prostitutes, a luxury condominium

and limousine service to Dimora, (R. 1024: Kelley, Trial Tr., PageID 25727-33,

25774-82, 25791-834), testified that he started to "kick in money" when Payne

9

complained to Kelley, "[t]hese guys are bleeding me dry." (R. 1022: Kelley, Trial Tr., PageID 25399). Kelley testified that he continued efforts to obtain the Stonebridge condominium key for Dimora, despite Dimora saying not to worry about it, because: "[a]s Mr. Dimora needed stuff and you were able to get stuff, . . . he became more open to your suggestions and ideas and needs at the [C]ounty level." (R. 1024: Trial Tr., PageID 25820). Kelley provided examples of Dimora agreeing to Payne's suggestions and needs, including the Stonebridge lease and budget allocations. (Id., PageID 25794-97). In a corroborating intercepted conversation between Kelley, Payne and Dimora, Payne agreed to give Dimora access to the Stonebridge condominium and Dimora agreed to help Payne on a County issue. (Gov't Ex. 809).

    As a second example, Russo also testified that contractor, Ferris Kleem (Counts 4-7), bribed Russo and Dimora with a Las Vegas vacation, cash and meals (including a $4,000 dinner party) in return for Dimora assisting Kleem with public contracts and a $150,000 County grant. (R. 1039: Russo, Trial Tr., PageID 28902-04, 29055-64). Kelley testified that Kleem gave Dimora the Las Vegas trip, gaming chips, a prostitute's services, and a dinner party and Dimora, in turn, helped Kleem's company on the Juvenile Justice Center (JJC) project and facilitated assignment of a particular County inspector who Kleem requested for a

10

County road project.  (R. 1024: Kelley, Trial Tr., PageID 25433-42; R. 1026: Kelley, Trial Tr., PageID 26171-86).  Kleem corroborated Russo and Kelley by admitting giving Dimora the Las Vegas trip, cash, meals, a prostitute and more, (R. 1014: Kleem, Trial Tr., PageID 23320-23, 23328-29, 23335-55, 23360, 23365, 23439, 23399, 23407; R. 1015: Kleem, Trial Tr., PageID 23707, 23709 (totaling at least $30,000, PSR, pp. 24-25)), "to gain influence in Cuyahoga County and . . . help my businesses and get protection for my businesses."  (R. 1014: Kleem, Trial Tr., PageID 23323).

The Title III calls corroborated Russo, Kelley and Kleem.  Dimora called Councilperson Sweeney on Kleem's behalf, just after Kleem gave Dimora $6,000 cash for the Las Vegas trip.  (Id., PageID 23377-81, 23418-19; R. 1039: Russo, Trial Tr., PageID 29061-62; Gov't Exs. 101-02, 400-Y, 517-18).  While sitting pool-side with Kleem at a private cabana that Kleem furnished in Las Vegas, Dimora called his office to inquire about Kleem's JJC bid.  (R. 1014: Kleem, Trial Tr., PageID 23436-37, 23452-56; R. 1013: Massie, Trial Tr., PageID 23223-24; Gov't Ex. 400-CC).  Kleem told Dimora he would pay for Las Vegas expenses and Dimora assured Kleem he would help Kleem's business on the JJC project.  (Gov't Ex. 400-N).  Immediately after returning from Las Vegas, Dimora instructed Kelley to make sure Kleem received the inspector Kleem wanted on a road project.

11

(Gov't Ex. 400-QQ).  In another call about Kleem's inspector request, Kelley

explained that Kleem "lost a big [C]ounty contract and Jimmy couldn't help him

on it, so he says, I really want to get this done for this guy."  (Gov't Ex. 513).

A third example involved the Alternatives Agency (AA) scheme.  Russo,

Kelley and AA's co-executive director, Brian Schuman, testified that AA bribed

Dimora in return for his help securing public funding for AA.  (R. 1039: Russo,

Trial Tr., PageID 29048-50; R. 1024: Kelley, Trial Tr., PageID 25841-45; R.

1016: Schuman, Trial Tr., PageID 24046-47, 24052-62, 24093-94).  Kelley

testified that AA sponsored Dimora's Las Vegas trip by first offering Dimora and

Russo cash and later airfare to Las Vegas in return for helping AA retain County

funding (Counts 2-3).  (R. 1024: Kelley, Trial Tr., PageID 25841-45).  When

Kelley asked Russo and Dimora for help reinstating AA's County funding and

Russo agreed to help, Kelley said, "I'll take care of you both."  (R. 1039: Russo,

Trial Tr., PageID 29049).  In an intercepted call, Kelley told Dimora that AA was

sponsoring a dinner party for Dimora to thank him for helping reinstate AA's

funding and to ask Dimora for more County funding.  (Gov't Ex. 212; see also R.

1017: Pokorny, Trial Tr., PageID 24135-41, 24145; R. 1017: McDonnell, Trial

Tr., PageID 24161, 24178, 24181; R. 1017: Ginely, Trial Tr., PageID 24253-56;

R. 1016: Massie, Trial Tr., PageID 23911-18).  In a related call, when Kelley

12

reminded Dimora about the upcoming AA funding vote, Dimora chided Kelley, stating that Dimora did not want to know what Kelley "get[s] out of" AA; Kelley agreed with Dimora, stating: the "less you know the better is right . . . speaking of that, Vegas," (Gov't Ex. 210), referencing their planned trip in which AA, through Kelley, paid for Dimora's and Russo's first class airline tickets to Las Vegas.

One final example of conspirators' testimony about bribes Dimora received related to contractors providing Dimora free home improvements.  Steven Pumper (Counts 17-21) testified about bribing Dimora with home improvements, cash, meals, sports tickets and other items, (R. 1034: Pumper, Trial Tr., PageID 27719-28, 27734-41, 27676-80, 27694-97, 27701-04, 27709-10, 27714-19), totaling approximately $100,000 (PSR, p. 30), to "[g]ain[] his influence," so "[w]henever I made a call to have something done, Mr. Dimora would make those calls on my behalf."  (R. 1034: Pumper, Trial Tr., PageID 27741).

Dimora tried to obstruct the investigation by sending checks to contractors to create the impression that he always intended to pay for the free home improvements he received from Pumper, Nicholas Zavarella, John Valentin and others from 2002 through 2008.  The contractors did not bill Dimora, nor did Dimora pay for the work before May 23, 2008, (R. 1034: Pumper, Trial Tr., PageID 27719-21, 27732, 27911, 27917-18; R. 1036: Valentin, Trial Tr., PageID

13

28225-40; R. 1036: Zavarella, Trial Tr., PageID 28300-02, 28301-02, 28304-05,

28309-10, 28315-16; R. 1037: Oliver, 28575, 28578-79; R. 1036: J. Shortridge,

Trial Tr., PageID 28265-69), the same day Dimora learned the FBI questioned

Pumper about bribing a building inspector.  (R. 1035: Pumper, Trial Tr., PageID

27894-98).  Dimora suddenly became cautious speaking on telephones, (R. 1010:

Trial Tr., PageID 22478; R. 1040: Russo, Trial Tr., PageID 29109), and

immediately issued checks, for even amounts, to each contractor.  (R. 1037:

Oliver, Trial Tr., PageID 28558-62, 28578-79; R. 1038: Oliver, Trial Tr., PageID

28647).  He instructed some contractors like Zavarella to prepare invoices.  (R.

1036: Zavarella, Trial Tr., PageID 28301, 28310-11).

The resulting invoices and contracts (prepared years after the work was

done) were replete with errors.  Pumper did not sufficiently back-date the contract,

having forgotten work DAS performed in 2002.  (R. 1035: Pumper, Trial Tr.,

PageID 27906-07).  Realizing the error, Dimora, via co-defendant Michael Gabor,

instructed Pumper to change the dates.  (Id., PageID 27907-08, 28004).

Additionally, Pumper's invoice omitted projects and costs.  (Id., PageID 27937-40,

27942, 27946).

At Dimora's request, Zavarella created an invoice.  (R. 1036: Zavarella,

Trial Tr., PageID 28311-12).  Zavarella's company, Zavarella Brothers

14

Construction (ZBC), had installed over $25,000 in brickwork at Dimora's residence over many years without charge. (Id., PageID 28298, 28300-02, 28305-09). Dimora never asked for an estimate, nor did ZBC bill for the work. (Id., PageID 28301-02, 28304-05, 28309-10, 28313). Suddenly, in 2008, Dimora told Zavarella, he "should bill" Dimora, explaining there were "some issues," that Zavarella "didn't do any [C]ounty work and [Dimora] didn't want [Zavarella] involved." (Id., PageID 28310). Afterward, Zavarella mailed a $6,800 invoice to Dimora. (Id., PageID 28311-12; R. 1039: Oliver, Trial Tr., PageID 28645-46). Dimora paid ZBC $500 on May 23, 2008, before the invoice arrived. (R. 1036: Zavarella, Trial Tr., PageID 28312, 28315-16).

Valentin's company, Salva Stone, installed granite throughout Dimora's house and in the outdoor kitchen, but never invoiced Dimora or discussed payment with him. (R. 1036: Valentin, Trial Tr., PageID 28215, 28219, 28221-35, 28238). Salva Stone received an unexpected check from Dimora for $250, dated May 23, 2008, the same date Dimora wrote checks to ZBC and DAS. (Id., PageID 28239-40).

Dimora tried to conceal other bribes by creating false paper trails and devising false explanations for bribes received. For example, Kleem testified about giving Dimora enough gambling money to qualify for a free suite in Las

15

Vegas.  (R. 1014: Kleem, Trial Tr., 23439, 23448).  Kleem's company also billed

Dimora for a refrigerator provided to Dimora, but Kleem gave Dimora cash with

which to pay the bill.  (Id., PageID 23345-46).  AA generated Dimora's bribe by

increasing Kelley's consulting payments, which Kelley used to purchase Dimora's

first class airline ticket for Las Vegas.  (R. 1016: Schuman, Trial Tr., PageID

24046-47, 25848-50; R. 1016: Massie, Trial, Tr., PageID 23970-84).  Dimora then

gave Kelley a check to create the appearance that Dimora paid for his airline

ticket, when in reality, Kelley gave Dimora cash in return for the check.  (R. 1024:

Kelley, Trial Tr., PageID 25879-80; R. 1039: Russo, Trial Tr., PageID 29050).

Russo testified that Dimora concealed incriminating notes by ripping them into

tiny pieces and throwing them out the window.  (R. 1039: Russo, Trial Tr., PageID

29092-93).

Dimora also lied about his relationships with bribe payors.  For instance,

Pumper testified that he and Dimora, with Gabor's help, planned to kick money

back to Dimora on projects awarded to Pumper's company, GreenSource.  (R.

1035: Pumper, Trial Tr., PageID 27788-99).  Yet, Dimora told a County employee,

"I don't get nothing" from GreenSource obtaining County work.  (Gov't  Ex.

1717).  Calls between Pumper and Gabor captured Gabor's admissions that the

County selecting GreenSource would "be great for everybody," (Gov't Ex.

16

1700-J), Dimora would be "rewarded" for helping GreenSource obtain business
(Gov't Ex 1700-R), and Dimora wanted to know his share.  (Gov't Ex. 1700-KK).

Dimora's other lies to County employees about his associations with bribers
included Dimora falsely telling his assistant, Pat Smock, that Dimora "just bumped
into Ferris Kleem" in Las Vegas (R. 1012: Massie, Trial Tr., PageID 22956
(discussing Gov't Ex. 400-FF)), before asking Smock about JJC Project bids,
when in fact, Kleem helped organize and pay for the trip.  (Id., PageID 22955-56;
R. 1014: Kleem, Trial Tr., PageID 23312-13, 23376-81, 23408-09; R. 1022:
Kelley, Trial Tr., PageID 25408-09, 25422-25; Gov't Ex. 400-FF).  Dimora also
falsely told Smock that a contractor named Neshkin called about a project, when
in truth, Zavarella made the inquiry.  (Gov't Ex 1203; R. 1037: Zavarella, Trial
Tr., PageID 28335-38).

Dimora sought to refute evidence of his intent through his publically filed
state ethics reports, on which he claimed to have disclosed the bribes.  Contrary to
Dimora's assertions, the district court did not exclude the reports.[1]  Before opening
statements, the court said it would "permit Defendant Dimora to get into th[e]
subject matter area" of Dimora's ethics reports, but cautioned that would open the

---

[1] The word limitation precludes the government from rebutting all Dimora's
misstatements about the record and the law.

17

door for the government to present witnesses about the reports' purpose and other matters.  (R. 1010: Trial Tr., PageID 22266).  The court later confirmed that Dimora could seek to admit the evidence during his case-in-chief.  (Id., PageID 22275).  When defense counsel noted that "there may . . . be times when the ethics disclosure forms are subject to relevant testimony that would be within the knowledge of the [government] witness testifying," (id., PageID 22276), the court ruled if defense counsel wished to cross-examine a government witness about the ethics reports, they should approach the bench before laying a foundation.  (Id., PageID 22277).  Dimora, however, chose not to cross-examine any government witness on this topic and "did not raise the issue again until after the government rested."  (R. 930: Opinion, PageID 18909).

The defense sought to introduce Dimora's ethics reports through a document custodian from the Ohio Ethics Commission.  (R. 1029: Trial Tr., PageID 26971-72).  The government objected to admissibility on hearsay grounds because a State records custodian could not lay a proper foundation to establish a hearsay exception, as the custodian had no knowledge about the truth of Dimora's statements in the reports.  (Id., PageID 26965-68).  The court agreed that "authentication is one thing, but actually talking about them is another thing." (Id., PageID 26971).

18

The government also challenged the reports' relevance. (<u>Id.</u>, PageID 26973). Defense counsel argued the reports were "public disclosures" that Dimora "receiv[ed] gifts and meals from people that he has been accused of receiving . . . surreptitiously, so it . . . goes to intent." (<u>Id.</u>; <u>see also</u> <u>id.</u>, PageID 26966). Dimora later filed a motion, arguing that the reports refuted evidence that he intended to hide his associations. (R. 681: Motion, PageID 13743-45; <u>see also</u> R. 1031: Trial Tr., PageID 27276).

The government agreed to stipulate to the reports' authenticity, but continued to object to admissibility based on hearsay and relevance. (R. 1030: Trial Tr., PageID 26984-92). Before accepting the parties' stipulation the next day, the court emphasized that it would not rule on admissibility based on authentication alone. (<u>Id.</u>, PageID 26988-92). The court found that Dimora was attempting to introduce his statements in the reports for the truth of the matter asserted. (<u>Id.</u>, PageID 27166-67). In declining to admit the reports absent "further explanation," the court stated that, to do so without a competent witness to testify about their content would be "tantamount to permitting the defendant to testify without being cross-examined." (<u>Id.</u>, PageID 27167). The court further found that the reports would confuse the jury because the gifts section did not ask the reporting person to specify the gift or the dollar amount. (<u>Id.</u>, PageID 27167-68).

19

Further, the meals section "seem[ed] to indicate that those were provided to the individual in their official capacity." (Id., PageID 27167). Thus, the court found that the "documents in an unexplained form" were inadmissible under Fed. R. Evid. 401 and 402. (Id., PageID 27168-69).

When renewing its motion to admit the forms the next day, defense counsel cited the government's contention that "Dimora hid associations" and that the reports were offered "for the simple fact to prove that a statement was made . . . ." (R. 1031: Trial Tr., PageID 27276). The government responded that Dimora tried to hide the bribes, not his associations. (Id., PageID 27277-78). The court reiterated its ruling that the reports contained hearsay which required "a competent witness" to testify about the reports' contents, as the parties' authenticity stipulation "standing alone" did not justify admission. (Id., PageID 27279). The court did not definitively exclude the reports, but rather observed, "There are a number of ways where the document may have become relevant, . . . and perhaps admissible, but nothing of the sort was presented to the court." (Id., PageID 27279-80). The court emphasized, "If you have the proper witnesses to testify regarding the document, I would certainly consider that, but all you have at this point is a stipulation to their authenticity." (Id., PageID 27282). In short, Dimora had not presented a competent witness to establish the reports' admissibility. (Id.).

20

The government subsequently proffered that if the court had admitted the reports, it would call the Ohio Ethics Commission Director to testify that all income that is reportable on a tax return, including bribes, must be disclosed in the reports' income section, not in the gifts section.  (Id., PageID 27285).  The court found that the reports would have required a "mini trial" about the reports' purpose and whether "that absolves a person from reporting any potential conflict to the entity that they serve, or any others as well."  (Id., PageID 27286).  The court re-emphasized that the reports required a competent witness for cross-examination, as "the document could not be cross-examined itself."  (Id., PageID 27289).  The court further noted that other ways to introduce the forms probably existed besides Dimora's testimony.  (Id., PageID 27289-90).

Despite the court granting defense counsel extra time through early adjournments for the defense to prepare its case, (R. 1029: Trial Tr., PageID 26973, 26979; R. 1030: Trial Tr., PageID 27141-43), defense counsel offered the ethics reports based only on the parties' authenticity stipulation and elected not to call competent witnesses about the reports.  (R. 1031: Trial Tr., PageID 27290).  The court denied Dimora's motion for a mistrial concerning the reports, noting that the court "said many times" the defense could "call a competent witness" to testify about the reports.  (R. 1046: Trial Tr., PageID 30585; see also id., PageID

21

30584).  "I'm not going to sit here and list all the numbers of ways that that could

have been done.  You were certainly permitted to do that."  (Id., PageID 30585).

The court reiterated its findings in denying Dimora's motion for a new trial,

(R. 930: Opinion, PageID 18907-13), noting that evidence that Dimora filed the

reports was insufficient to show "Dimora's willingness to disclose his relationship

with contractors and certain alleged co-conspirators, . . . , [as he also needed to

offer evidence of ] the facts disclosed (i.e., that he had received things of value

from contractors and co-conspirators and had not received other things of value

not listed on the forms)."  (Id., PageID 18911).  The court concluded that absent

"some evidence to prove the truth of the disclosures, the testimony would have

been rank hearsay."  (Id.).

22

## SUMMARY OF THE ARGUMENT

The trial court did not flatly exclude Dimora's ethics reports; it required proper testimony to introduce them.  Dimora did not seek their admission for the simple fact that he filed them.  Instead, he sought to admit hearsay statements in the reports about receiving "gifts" and meals without subjecting anyone with personal knowledge about his statements to cross-examination about the reports' fallacies, omissions and inclusion of unspecified things of value received under the wrong reporting section.  Thus, the court properly required Dimora to present a competent witness to testify about the contents before admitting the reports into evidence.

Further, the reports were irrelevant, as their probative value hinged on the truthfulness of Dimora's responses, which he did not attempt to establish through a competent witness.  The reports also would have resulted in a mini-trial about their purpose, causing jury confusion and significantly outweighing any probative value.  Moreover, the reports constituted one piece of circumstantial evidence which would have been heavily outweighed by evidence that Dimora omitted several bribers' names from the reports and the fact that all nine cooperating witnesses testified that, on the charged occasions, Dimora received the bribes in exchange for official acts, not as gifts, as the forms indicated.

23

Next, the court properly excluded irrelevant evidence that, on occasions other than those charged, Dimora assisted people who did not bribe him. The government did not allege that Dimora performed all official acts in exchange for bribes. Thus, Dimora's proffered "good guy" evidence would not negate evidence that he engaged in fraud and accepted bribes in return for his influence on the charged occasions.

Third, the court's instructions on *quid pro quo* were nearly identical to those approved in United States v. Terry, 707 F.3d 607 (6th Cir. 2013), as "match[ing] the definition of bribery." Id. at 614. The court's instructions properly recognized that a dual purpose in accepting a thing of value does not insulate a public official from criminal liability if the government proves an unlawful intent. Indeed, Dimora was free to argue under the court's instructions that he received things of value based solely on friendship or the giver's generalized attempt to buy goodwill. Dimora's emphasis on the government's argument that his acts were not mere coincidence to the things of value he received is misplaced, as the government's argument referred to its burden of proving "the payments were made in connection with an agreement, which is to say 'in return for' official acts under it," a requirement Terry recognized. Id. at 613.

24

The court's instruction that official acts include informal official influence correctly reflected this Court's rejection of a heightened *quid pro quo* standard in Hobbs Act and 18 U.S.C. § 666 cases.  United States v. Abbey, 560 F.3d 513 (6th Cir. 2009).  Beyond Abbey, Dimora's proposed official acts instructions conflicted with United States v. Birdsall, 233 U.S. 223, 230 (1914), recognizing that official action may be shown by settled practice and established usage, as well as case law that a Hobbs Act defendant need not have actual power to do the official act he promises to do if the briber reasonably expects the defendant possesses the power. Thus, the court properly declined to give Dimora's proposed instructions.

Finally, the evidence showed that Dimora engaged in official acts in connection with the Zavarella, Valentin and Gina Coppers schemes.  At Zavarella's request, Dimora recommended Zavarella's neighbor for County employment with Russo and inquired about a County project for which Zavarella's company would serve as a subcontractor.  Dimora also voted to approve funds for the Auditor's Office to start a foreclosure board that was intended to provide Valentin's daughter employment.  Finally, beyond voting to release 40% of the salary of the very person he lobbied to create a job for Coppers, at a salary acceptable to her, Dimora made several material omissions and misrepresentations

25

when securing public employment for Coppers.  Thus, reversal of any count is

unwarranted.

26

## ARGUMENT

**I.    THE DISTRICT COURT CORRECTLY REQUIRED DIMORA TO INTRODUCE INTO EVIDENCE HIS STATE ETHICS REPORTS THROUGH A COMPETENT WITNESS TO TESTIFY ABOUT THE REPORTS' CONTENTS, WHERE DIMORA'S DISCLOSURES ABOUT UNSPECIFIED GIFTS AND MEALS HE RECEIVED OTHERWISE CONSTITUTED IRRELEVANT HEARSAY.**

**A.    Standard of Review**

"Whether a statement constitutes hearsay is a legal question that we review *de novo*." United States v. Boyd, 640 F.3d 657, 663 (6th Cir. 2011).  This Court "reviews for clear error the court's factual determinations that underpin its legal conclusions."  United States v. McDaniel, 398 F.3d 540, 544 (6th Cir. 2005) (citation and internal quotation marks omitted).  This Court reviews a district court's "evidentiary rulings under the abuse-of-discretion standard.  This deferential standard of review applies to a district court's determinations of the relevance of evidence under Rule 401, as well as determinations under Rule 403 that the prejudicial value of evidence outweighs its probative value."  United States v. Ashraf, 628 F.3d 813, 826 (6th Cir. 2011) (internal citation and quotation marks omitted).

27

## B.    Argument

In asking the court to admit the hearsay statements contained in his state ethics reports, Dimora attempted to avoid cross-examination about: (1) the reports' limitations; (2) Dimora's omissions; and (3) listing unspecified things of value received under the wrong reporting section.  Dimora incorrectly argues that the court flatly <u>excluded</u> the reports.  The court did not exclude them; it required Dimora to present a competent witness to testify about the reports and gave him full opportunity to do so.  (R. 1030: Trial Tr., PageID 27166-69; R. 1031: Trial Tr., PageID 27279-90).

The court said it would "permit Defendant Dimora to get into th[e] subject matter area" of the reports, (R. 1010: Trial Tr., PageID 22266), but the court never agreed to admit the reports based on authentication alone.  (R. 1031: Trial Tr., PageID 27287-89).  The court's ruling that Dimora must comply with the Federal Rules of Evidence only required a proper evidentiary foundation.  (R. 1030: Trial Tr., PageID 27166-69; R. 1031: Trial Tr., PageID 27279-90).  In fact, the court explained repeatedly that Dimora <u>could seek admission</u> of the reports by establishing their relevancy and presenting a competent witness to testify about their contents.  (<u>Id.</u>).  These evidentiary conditions did not deprive Dimora of the right to present a defense.

28

While "[p]resenting <u>relevant</u> evidence is integral" to a defendant's right to present a defense, "th[at] right is not absolute." <u>Baze v. Parker</u>, 371 F.3d 310, 323-24 (6th Cir. 2004) (emphasis added) (internal citations omitted).  "[C]riminal defendants do not have a right to present evidence that the district court, in its discretion, deems irrelevant or immaterial." <u>United States v. Prince-Oyibo</u>, 320 F.3d 494, 501 (4th Cir. 2003); <u>accord</u> <u>Jackson v. Norris</u>, 651 F.3d 923, 926 (8th Cir. 2011); <u>United States v. Vazquez-Botet</u>, 532 F.3d 37, 51 (1st Cir. 2008); <u>Morgan v. Krenke</u>, 232 F.3d 562, 566 (7th Cir. 2000).  "In the exercise of this right, the accused, as is required of the [prosecution], must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." <u>Chambers v. Mississippi</u>, 410 U.S. 284, 302 (1973).  Consequently, a defendant's right to present a defense does not include an "unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." <u>Taylor v. Illinois</u>, 484 U.S. 400, 410 (1988).

Evidence may be excluded "through the application of evidentiary rules that themselves serve the interests of fairness and reliability -- even if the defendant would prefer to see the evidence admitted." <u>Crane v. Kentucky</u>, 476 U.S. 683, 690 (1986).  For instance, "[e]vidence that is 'deemed insufficiently unreliable,' such

29

as hearsay evidence, is excludable even if it may be relevant to the defense."

McCullough v. Stegall, 2001 WL 966282, *2 (6th Cir. 2001) (unpublished)

(quoting Montana v. Egelhoff, 518 U.S. 37, 42 (1996)).

    1.   Hearsay

    The district court correctly concluded that Dimora's ethics reports

constituted hearsay.  Hearsay is an out-of-court statement, including a "written

assertion," offered to establish the truth of the matter asserted.  Fed. R. Evid.

801(a), (c).  While Dimora claims he offered the reports to establish that he

disclosed (rather than concealed) receiving things of value over $75 and meals

from coconspirators, Dimora critically downplays that he characterized the

unspecified things of value as gifts and the unspecified meals over $100 as

provided in connection with his official duties.  (See, e.g., R. 940-2, PageID

19114-16).  Indeed, Dimora did not limit his proffer of the reports to the fact that

he made disclosures.  Instead, he sought to introduce the contents of his

disclosures, (R. 1029: Trial Tr., PageID 26966-67; R. 1031: Trial Tr., PageID

27276), as the reports themselves had no meaning without their contents, i.e.,

without Dimora's statements.  By attempting to introduce the contents of his

statements to contradict evidence of concealment, Dimora sought to establish the

truth of the matter asserted without subjecting himself or anyone else to cross-

30

examination about the reports' contents.  (R. 1030: Trial Tr., PageID 27167; R. 1031: Trial Tr., PageID 27289).

Dimora tried to overcome hearsay with an Ohio Ethics Commission witness. (R. 1029: Trial Tr., PageID 26971-73).  While an Ohio Ethics Commission employee could testify about storing and maintaining the reports, the employee could not testify about Dimora's statements in them under the business record exception of Fed. R. Evid. 803(6) because Dimora was not an Ethics Commission employee and the records custodian had no knowledge about the truthfulness of the information Dimora supplied.  See Fed. R. Evid. 803(6)(E) (under the business record exception, "neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness").  As the district court recognized "authentication is one thing, but actually talking about them is another thing."  (R. 1029: Trial Tr., PageID 26971).  Thus, the district court correctly concluded that admitting the reports without a competent witness to testify about their contents would be "tantamount to permitting the defendant to testify without being cross-examined."  (R. 1030: Trial Tr., PageID 27167).

Below, the court relied upon United States v. Hatchett, 918 F.2d 631 (6th Cir. 1990), which upheld excluding hearsay testimony about the defendant's disclosures to an attorney.  (R. 1031: Trial Tr., PageID 27283; R. 930: Opinion,

31

PageID 18910).  In Hatchett, a non-testifying defendant in a tax case sought to present an advice-of-counsel defense through the testimony of an attorney the defendant consulted.  Id. at 637-38.  Like Dimora, Hatchett offered testimony about the contents of his disclosure.  Id. at 638.  In upholding the exclusion of the testimony, this Court noted that Hatchett declined to testify and distinguished another case admitting an attorney's testimony where "[a] codefendant had already related the matters disclosed, and the lawyer's recounting of the disclosures was not needed to prove their truth."  Id. at 638 n.8.  The Court also approvingly cited the district court's decision noting that "[t]he relevance of the facts disclosed could only have been determined *had the jury considered as truthful* the out-of-court statements which attorney Gettleson was asked to recite. " Id. (emphasis in original).  This Court, therefore, upheld the exclusion of the hearsay testimony.

Here, the district court correctly recognized that, "to show 'Mr. Dimora's willingness to disclose' his relationship with contractors and certain alleged co-conspirators [concerning the things of value he received], it would have been necessary to offer more than evidence that he filed disclosure forms," such as evidence "that he had received things of value from contractors and co-conspirators and had not received other things of value not listed on the forms." (R. 930: Opinion, PageID 18911).  As the court found, "[w]ithout some evidence

32

to prove the truth of the disclosures, the testimony would have been rank hearsay."
(Id. (footnote omitted)).

The court repeatedly invited the defense before resting to present a competent witness to testify about the reports. (R. 1030: Trial Tr., PageID 27167-68; R. 1031: Trial Tr., PageID 27279-83, 27286, 27289-90). The court also granted extra time to allow the defense to interview potential witnesses. (R. 1029: Trial Tr., PageID 26973, 26979; R. 1030: Trial Tr., PageID 27141-43). Dimora declined the court's offers, insisting that the court admit the reports solely on an authenticity stipulation. (R. 1031: Trial Tr., PageID 27290). Dimora also did not cross-examine government witnesses about the reports, (id., PageID 27283; R. 1046: Trial Tr., PageID 30584-85; R. 930: Opinion, PageID 18909), despite that opportunity, (R. 1010: Trial Tr., PageID 22277), and the court's ruling permitting him "to offer evidence that the . . . things of value Dimora received from contractors were given out of friendship, and were not given in exchange for official action." (R. 930: Opinion, PageID 18908 n.24 (citing R. 602: Opinion, PageID 12711)). Additionally, Dimora declined to call a government witness on that issue. (R. 930: Opinion, PageID 18909). On these facts, the court properly required the defense to present a competent witness to testify about the reports' contents before admission.

33

2.   <u>Irrelevance</u>

Hearsay issues aside, the reports were irrelevant, as their probative value

hinged on the truthfulness of Dimora's responses, which Dimora could not

demonstrate without a competent witness.  Under Fed. R. Evid. 401(a),

"[e]vidence is relevant if: (a) it has any tendency to make a fact more or less

probable than it would be without the evidence."  Dimora's reports however, did

not list "everybody that bought him dinner. . . [and] gave him things of value," as

defense counsel incorrectly argued during opening statements.  (R. 1010: Trial Tr.,

PageID 22381).

While Dimora now contends the forms would have refuted claims that he

concealed receiving things of value from nine of eleven bribers in Counts 2-9 and

11-27, at minimum, Dimora did not disclose receiving "gifts" from four bribers in

that offense grouping, including:

> 1) <u>Payne</u>, who provided Dimora free limousine services between
> 2003 and 2008, prostitutes and access to a Stonebridge condominium[2]
> (Count 8) (<u>Compare</u>, R. 1017: Gallagher, Trial Tr., PageID 24280; R.
> 1018: Massie, Trial Tr., PageID 24404, 24431-36, 24443-45,

---

[2]  Dimora's contention that Payne received free limousine service is false.
While Payne initially received limousine services through a bartering arrangement
for legal fees, once that arrangement ended, Payne paid for Dimora's limousine
services by credit card.  (R. 1018: Massie, Trial Tr., PageID 24458-59, 24478-79;
R. 1024: Kelley, Trial Tr., PageID 25774; R. 1018: Pistone, Trial Tr.,
PageID 24544, 24555-57, 24591-92).

24452-59, 24479; R. 1018: Pistone, Trial Tr., PageID 24557; R.
1024: Kelley, Trial Tr., PageID 25728-30, 25774-76, 25780-82,
25791, 25798-99, 25822-23, 25829-30; R. 1019: Johnson, Trial Tr.,
PageID 24661-67, 24670-77; R. 1039: Russo, Trial Tr.,
PageID 28928-30, 28932-33, 28936-41, with R. 940-2:
PageID 19155, 19126, 19139, 19153, 19169, 19186);

2)  AA, the halfway house that paid for Dimora's first class airfare to
Las Vegas and a dinner at Delmonico's totaling over $800 in 2008
(Count 2) (Compare R. 1016: Massie, Trial Tr., PageID 23931-32,
23953-54; R. 1024: Kelley, PageID 25841-50, 25870-73, 25878-80;
R. 1027: Kelley, Trial Tr., PageID 26636-38; R. 1016: Schuman,
Trial Tr., PageID 24052-55, with R. 940-2: PageID 19186-87);

3)  Valentin and Salva Stone, which provided free granite and
installed it at Dimora's residence in 2007 and 2008 (Count 11)
(Compare R. 1036: Valentin, Trial Tr., PageID 28219, 28221-38, with
R. 940-2, PageID 19169, 19186)[3]; and

4)  Coppers, from whom Dimora accepted a hotel room valued at
$121 and sexual services in 2008 (Count 9) (compare R. 1019:
Massie, Trial Tr., PageID 24757-62, with R. 940-2, PageID 19186).

Moreover, Dimora did not list Samir Mohammad under the 2003 "gift"

section (R. 904-2, PageID 19115), even though Mohammad funded Dimora's

2003 Niagara Falls gambling trip and provided $2,000 that Daniel Gallagher

handed Dimora during the trip to keep "Mohammad in mind" for the County

---

[3]  While Dimora may have misspelled Valentin as "Valentine" in the 2006
and 2007 reports (R. 940-2, PageID 19153, 19169), that ambiguity, combined with
Dimora listing the wrong years, underscores the necessity of Dimora presenting a
competent witness to testify about the reports' contents.

35

Administrator position (Count 1).  (R. 1019: Gallagher, Trial Tr., PageID 24278-
79, 24282-24301; R. 1039: Russo, Trial Tr., PageID  28931-33).

Dimora also omitted Kelley's name from the 2003 reports.  (R. 904-2,
PageID 19115-16).  Yet, in fall 2003, Kelley paid for Dimora's airfare and hotel
room for a New Orleans gambling trip.  (R. 1024: Kelley, Trial Tr., PageID 25744-
46 (admitted under Fed. R. Evid. 404(b)).  Kelley also testified about spending
approximately $20,000 on sponsored meals for Dimora between 2003 and July 28,
2008, and contributing money toward the prostitutes Payne provided Dimora.  (Id.,
PageID 25751, 25776-81).

Additionally, Dimora failed to list any of the corporate entities that bribed
him.  As the government argued below, the reports "ha[ve] no meaning if it's not
for the truth of the matter asserted, because if the disclosure is inaccurate, it has no
probative value."  (R. 1029: Trial Tr., PageID 26973).  Given Dimora's failure to
list several bribers, including any of the corporate entities that provided things of
value to him, the reports were irrelevant.  Indeed, someone reviewing the reports'
conflicts of interest sections would be misled, as Dimora's failure to list corporate
entities demonstrated the reports' lack of transparency.  For example, Dimora
received things of value from William Neiheiser and Reliance Mechanical, but the
official act was for Neiheiser's companies, Reliance Mechanical and Winterhurst.

36

(R. 1024: Kelley, Trial Tr., PageID 25872; R. 1021: Massie, Trial Tr., PageID

25336, 25341-46, 25360-61, 25365; R. 1037: Oliver, Trial Tr., PageID 28516).

Similarly, Dimora received things of value from DAS, but Dimora provided

official acts for Pumper personally, DAS and for Pumper's other companies,

including GreenSource. (R. 1034: Pumper, Trial Tr., PageID 27719-28, 27676-80,

27694-97, 27701-04, 27709-10, 27714-19, 27742, 27814-15, 27822-24, 27828-29,

27849, 27859-72).

Moreover, the fact that Dimora reported receiving "gifts" and meals from

some individuals was irrelevant, as it would not negate evidence that Dimora

concealed receiving <u>bribes</u> in exchange for using his influence on the bribers'

behalves when needed. Nor would his disclosures about receiving gifts and meals

absolve him of criminal liability for accepting those bribes, (<u>see generally</u>, R. 602:

Order, PageID 12711), as the reports specifically state that "[a]ny person . . . who

files a false statement is subject to criminal prosecution." (<u>See, e.g.</u>, R. 940-2,

PageID 19086).

3.    <u>Fed. R. Evid. 403</u>

Additionally, the reports were inadmissible under Fed. R. Evid. 403, which

permits a court to exclude evidence, even if relevant, "if its probative value is

substantially outweighed by a danger of . . . unfair prejudice, confusing the issues,

misleading the jury, undue delay, wasting time, or needlessly presenting

cumulative evidence." Fed. R. Evid. 403.  The reports, if admitted, would have

resulted in a mini-trial, including the government presenting evidence:

> (1) [about] the purpose of the disclosure forms, (2) [about] Ohio rules
> governing conflict of interest, misusing public office, bribery and
> theft in office, (3) [about] training provided to public officials on the
> governing rules, and (4) [that] following the indictment in the Gray
> case [a highly publicized Cleveland public corruption case] which
> charged mail fraud in connection with false disclosure forms,
> Defendant Dimora began hand delivering his disclosure forms, rather
> than mailing the forms.

(R. 589: Response, PageID 12531 (internal brackets omitted); see also R. 930:

Opinion, PageID 18911; R. 1031: Trial Tr., PageID 27285-86; R. 1010: Trial Tr.,

PageID  22266).  The government also would have called the Director of the Ohio

Ethics Commission to testify "that all income from any source that is reportable on

a tax return, including bribery, should have been reported under the [report's]

income section," (R. 1031: Trial Tr., PageID 27285), not the gift section as

Dimora reported.

Further, Dimora's vague disclosures about gifts and meals he received

highlight the reports' irrelevance and likelihood they would confuse the jury.  As

the district court recognized, the forms do not ask the reporting person to specify

the gift or the dollar amount.  (R. 1030: Trial Tr., PageID 27167).  "All you know

is that it's a gift over $75." (Id.). Without knowing which "gifts" Dimora reported, the reports did not demonstrate that Dimora disclosed the things of value that cooperating witnesses testified he received as bribes.

Similarly, listing those who provided unspecified meals, did not show that Dimora openly disclosed the meals he received from bribers. As the court recognized, the reports' "meals portion . . . would be very confusing to this jury as well without a competent witness to explain, because that seems to indicate that those were provided to the individual in their official capacity . . . ." (Id.; accord R. 930: Opinion, PageID 18912). Indeed, "[w]hile Dimora claims . . . the fact that he listed . . . certain co-conspirators in response to Question No. 3 is evidence of his willingness to reveal these connections, the fact remains that free dinners and other things of value offered by contractors seeking County projects would not have been expenses legitimately received 'in connection with [Dimora's] official duties.'" (R. 930: Opinion, PageID 18912). Thus, "[n]ot only would such a disclosure have to be explained in the context of the law relating to the duties of a Commissioner, it would also have had the effect of implicating Dimora in wrongdoing by virtue of his arguably inappropriate disclosure," with the "only possible result . . . [of] thoroughly confus[ing] the jury." (Id.).

39

The district court also recognized that the statement on the form about disclosure increasing public awareness about potential conflicts and reassuring the public about the integrity of the government, suggested that "disclosure equates with transparency" and, consequently, "would have the effect of usurping the jury's province, by suggesting that the Ohio Ethics Commission had already determined that Dimora, by virtue of his disclosure, lacked the intent to conceal the fraud." (Id., PageID 18913). Also problematic was the fact that Dimora's statements in the reports were "made under penalty of perjury," but yet "not subject to cross-examination." (Id.). Thus, the court correctly found that the reports "would confuse the jury as to the weight to give these untested statements, and unfairly prejudice the government." (Id.). Accordingly, on balance, the court properly found that "any limited probative value [of the reports] would have been 'substantially outweighed by . . . unfair prejudice, confusing the issues, [and] misleading the jury." (Id. (quoting Fed. R. Evid. 403)).

Dimora's claim that the district court "*sua sponte*, expanded on its decision" post-trial, is wrong. (Dimora's Br., p. 13 (emphasis added)). Dimora's motion for a new trial "renew[ed] his objections and motions for mistrial," (R. 875: Motion, PageID 18182 (emphasis added)), thereby including his motion "for a mistrial . . .

40

bas[ed] [on] . . . th[e] court[] not permitting the admission of the . . . report[s]."

(R. 1046: Trial Tr., PageID 30580).

While Dimora claims, based on a trial excerpt, that the court only expressed

concern about "two preprinted" report sections "after trial," (Dimora's Br., p. 27

n.7 (quoting R. 1030: Trial Tr., PageID 27167-68)), Dimora ignores the court's

immediately preceding trial observations about the confusing nature of the reports'

gifts and meals sections, which belie his claim.  (R. 1030: Trial Tr., PageID 27167,

lines 8-23).  The court's conclusion about the reports' limited probative value

given evidence that Dimora was "often seen in public dining with contractors who

were seeking [C]ounty work," (R. 930: Opinion, PageID 18913), also was not

erroneous since Dimora sought to admit the reports "to refute the Government's

continuous claims that Mr. Dimora . . . intended to hide their associations.'"  (Id.,

PageID 18909 n.25 (quoting R. 681: Motion, PageID 13743); accord R. 1029:

Trial Tr., PageID 26972).  Contrary to Dimora's assertion below, however, the

government argued that Dimora tried to hide the bribes, not his associations.  (R.

1031: Trial Tr., PageID 27277-78).

        4.  No Prejudice

Even if *arguendo* the court abused its discretion by requiring that Dimora

properly present the evidence, "evidentiary rulings rarely constitute a violation of

41

a defendant's right to present a defense." <u>United States v. Hardy</u>, 586 F.3d 1040,

1044 (6th Cir. 2009).  "In asking whether Defendant was ultimately denied a

meaningful defense, . . . [this Court] look[s] to whether the improperly excluded

evidence . . . would have created a reasonable doubt as to Defendant's guilt,"

<u>United States v. Blackwell</u>, 459 F.3d 739, 757 (6th Cir. 2006), a standard not met

here.

a.  Mail/Wire Fraud--Counts 2, 9 and 16

Counts 2, 9 and 16 charged mail/wire fraud conspiracy, which requires, as

an element, proof of material misrepresentation or omission.  Dimora's emphasis

on the prosecutor's questions about whether anyone disclosed that: (1) Neiheiser

gave Dimora a $3,600 check; (2) AA paid $826 for a meal Dimora attended at

Delmonico's and contributed to Dimora's trip to Las Vegas; and (3) Coppers

provided Dimora something of value, is misplaced.  (<u>See</u> Dimora's Br., pp. 57-60).

Those questions concerned the government's burden to establish Dimora

"knowingly made a material misrepresentation or knowingly omitted a material

fact." <u>United States v. Ediger</u>, 2006 WL 328010, *5 (6th Cir. 2006)

(unpublished); <u>see also</u> <u>United States v. DeSantis</u>, 134 F.3d 760, 764 (6th Cir.

1998) (mail fraud).  Eliciting testimony concerning Dimora's omissions about

42

receiving things of value from those for whom he sought assistance, therefore,

went directly to an element.

### b.  Nondisclosure--Counts 1-9, 11-27

Dimora's disclosures omitted things of value he received from Mohammad,

AA, Payne and Kelley, Coppers and Valentin/Salva Stone.  (See R. 940-2,

PageID 19155, 19126, 19139, 19153, 19169, 19186).  Dimora also did not list

ZBC, Reliance Mechanical, DAS, DAS Development, Blaze

Construction/Building, Phoenix Cement, FJR Properties, Teamz Restaurant, Tony

K's Restaurant, Vandra Brothers, the Local 55 Plumber's Union and Financial

Network of America.  Thus, the reports would not have cast doubt about his guilt

on those counts.

### c.  Bribes--Counts 3-8, 11-15, and 17-27

The reports would not have created a reasonable doubt concerning Dimora's

guilt on any bribery and Hobbs Act counts.  Each bribe payor gave multiple things

of value.  Thus, without specifying particular "gifts" and meals on the reports, the

jury would have no way to determine whether Dimora disclosed some or all of the

things of value.  Beyond Dimora's ambiguous disclosures, as the district court

noted, there was no testimony that the reports were "provided to any of the

decision-makers . . . who voted on matters."  (R. 1031: Trial Tr., PageID 27279).

43

While Dimora emphasizes the prosecutor's questions about whether Dimora disclosed the things of value to decision makers from whom he sought assistance for the bribers, as the government noted "secrecy is very relevant evidence of intent." (R. 1020: Trial Tr., PageID 25129 (discussing the Robert Rybak Hobbs Act Counts 24-25)); see also United States v. White, 663 F.3d 1207, 1214 (11th Cir. 2011) (recognizing in a Section 666 federal funds bribery case that the extent parties "conceal their bribes is powerful evidence of their corrupt intent"). For instance, despite listing Kleem on the reports, Dimora actively concealed from his own assistant, Smock, that Dimora's and Kleem's meeting in Vegas was planned, not coincidence, as Dimora falsely claimed. (R. 1012: Massie, Trial Tr., PageID 22956).

Concealment was only one way the government proved Dimora's intent, however. The government also proved Dimora's intent through:

(1) The bribers' testimony establishing the things of value they provided constituted bribes. (R. 1014: Kleem, Trial Tr., PageID 23323, 23338-41, 23345-47, 23360; 23399, 23407, 23439; R. 1015: Kleem, Trial Tr., PageID 23707-09; R. 1019: Gallagher, Trial Tr., PageID 24278-95, 24310; R. 1022: Kelley, Trial Tr., PageID 25395-96; R. 1024: Kelly, Trial Tr., PageID 25840-53, 25859-60, 25879-80; R. 1027, PageID 26490-91, 26636-38; R. 1016: Schuman, Trial Tr., PageID 24043, 24052-55, 20061-62; R. 1034: Pumper, Trial Tr., PageID 27741-42; R. 1037: Zavarella, Trial Tr., PageID 28331; R. 1036: Valentin, PageID 28233; 28226, 28242; R. 1038: Randazzo, Trial Tr., PageID 28816-17);

44

(2) Intercepted telephone calls, including Gov't Exs. 210, 400-NN, Gov't Ex. 1407 and 809;

(3) Russo's testimony about how he and Dimora operated, including providing regular meal sponsors "personal attention on anything that came up." (R. 1039: Russo, Trial Tr., PageID 28901; see also id., PageID 28931, 28936-49, 29048-51);

(4) Circumstantial evidence about the timing of the bribes Dimora received and his official acts.  (R. 1012: Massie, Trial Tr., PageID 22935-43, 22954-56; R. 1014: Kleem, PageID 23323, 23377-81, 23408-09, 23420, 23436-39, 23448-55, 23459-65, 23469-74; R. 1024: Kelley, Trial Tr., PageID 25872-74; R. 1021: Massie, Trial Tr., PageID 25336, 25341-46, 25365; R. 1021: Ross, Trial Tr., PageID 25260-61, 25285-86; R. 1034: Pumper, Trial Tr., PageID 27743-44, 27747-48; R. 1037: Oliver, Trial Tr., PageID 28516; R. 1038: Oliver, Trial Tr., PageID 28669); and

(5) Dimora's obstruction, including Dimora writing several checks to contractors the day the FBI approached Pumper about bribery.  (R. 1035: Pumper, Trial Tr., PageID 27894-278901, 27911, 27917-18; R. 1038: Oliver, Trial Tr., PageID 28647; R. 1036: Valentin, Trial Tr., PageID 28239-40; R. 1036: D. Shortridge, Trial Tr., PageID 28279; R. 1037: Oliver, Trial Tr., PageID 28558-62, 28578-79; R. 1036: Zavarella, Trial Tr., PageID 28315-16).

Simply put, the reports constituted one piece of irrelevant circumstantial hearsay evidence that would have been heavily outweighed by the testimony of those who bribed Dimora, stating they gave Dimora things of value in exchange for official acts, and the heavy weight of corroborating evidence.

45

d.  Obstruction--Counts 28-29

Dimora's contends that, if he prevails about the reports, this Court

necessarily must reverse his obstruction convictions.  Dimora ignores the fact that

even if acquitted of bribery, a defendant need not be guilty of the underlying

offense investigated to sustain a conviction for obstructing that investigation.

Callanan v. United States, 881 F.2d 229, 236 (6th Cir. 1989) (unnecessary

references to the mail fraud statute in the obstruction count could "be stricken as

surplusage without running afoul . . . the Fifth Amendment," as "the crime under

investigation is not an essential element of the offense of obstruction of a criminal

investigation").  In short, Dimora's obstruction convictions stem from conduct

separate from the underlying bribery.

e.  Tax Returns--Counts 34-37

Finally, the reports would have incriminated Dimora on the tax counts since

he did not disclose receiving things of value from Payne, including limousine

services and prostitutes, between 2004 through 2007--the same years covered by

the tax counts.  (R. 1042: Fatula, Trial Tr., PageID 29640-41, 29652-53, 29655-

56).  In short, Dimora's nondisclosure on the reports would have bolstered

evidence that Dimora concealed income he received as bribes.  Dimora's

arguments about the ethics reports, therefore, are without merit.

46

5. <u>Russo's Reports</u>

Dimora's argument about the district court excluding Russo's ethics reports also is without merit. The court properly declined to admit Russo's ethics reports unless Dimora established their relevancy, (R. 1029: Trial Tr., PageID 26941), which Dimora did not do. Notably, Dimora did not "discuss[] [the reports] in Mr. Russo's direct or cross-examination." (<u>Id.</u>, PageID 26940). Nor did he call Russo as a defense witness, thus, creating the same hearsay problem that existed with Dimora's reports.

As the prosecutor explained below, "There's no allegation that Jimmy Dimora and Frank Russo worked together on, quote, 'everything.' . . . We never alleged that they worked together or schemed together with respect to their disclosure report[s]." (<u>Id.</u>, PageID 26941). Instead, the evidence showed that Dimora and Russo worked together *sometimes*. Accordingly, given the absence of evidence showing that Dimora and Russo worked together on their ethics reports, Dimora failed to show how Russo's reports were relevant.

The fact that Russo did not disclose receiving things of value from contractors and co-conspirators did not establish relevance. The differences between Dimora's and Russo's reports merely demonstrate two ways to conceal bribes -- the Russo complete-nondisclosure-method and the Dimora

47

misrepresentation-of-bribes-as-gifts-method.  Russo's nondisclosure strategy

simply was not relevant to Dimora's concealment of bribes in a different manner.

Thus, the district court correctly declined to admit the reports unless Dimora first

established their relevance.  (Id., PageID 26941).

## II.    THE DISTRICT COURT CORRECTLY EXCLUDED DIMORA'S REVERSE RULE 404(b) EVIDENCE, WHERE IT WOULD NOT NEGATE HIS CRIMINAL INTENT.

### A.    Standard of Review

The standard for determining admissibility under Fed. R. Evid. 404(b) applies to reverse 404(b) cases.  United States v. Clark, 2010 WL 1924710, *7 (6th Cir. 2010) (unpublished).  "This Court has 'a longstanding intra-circuit conflict regarding the appropriate standard of review for evidentiary decisions under Rule 404(b) . . . .'"  United States v. James, 2012 WL 3608612, *5 (6th Cir. 2012) (unpublished) (quoting United States v. Clay, 667 F.3d 689, 703 (6th Cir. 2012) (Kethledge, J., dissenting)).  For instance, "[s]ome panel decisions review 404(b) evidence de novo," id., where as, others "apply the more deferential abuse of discretion standard that this Circuit utilizes in every other evidentiary ruling."  Id. (collecting cases); see also United States v. Mack, 258 F.3d 548, 553 n.1 (6th Cir. 2001).  This Court also has recognized in a reverse 404(b) case that "[a] district court's determination of admissibility based on relevance and prejudice is reviewed for an abuse of discretion and will not be overruled lightly."  United States v. Daulton, 2008 WL 116356, *4 (6th Cir. 2008) (unpublished) (citing United States v. Jackson-Randolph, 282 F.3d 639, 376 (6th Cir. 2002)).

49

**B.      Argument**

The district court correctly excluded from evidence testimony that, on

occasions other than those charged, Dimora assisted people who did not pay

bribes.  Dimora's argument that the court did not "apply any steps of the standard

[404(b)] analysis" (Dimora's Br., p. 41), in making the determination, is meritless.

This Court has squarely rejected a claim that "a district court commits reversible

error whenever it fails to take each explicit step in the analysis."  United States v.

Tasis, 696 F.3d 623, 628 (6th Cir. 2012).  "[W]hat a [trial] court must do is

permissibly exercise its discretion within the boundaries of the Rule," id. at 628,

which the trial court did here.

Evidence that, on other uncharged occasions, a defendant had an

opportunity to but did not commit a crime similar to that charged, is irrelevant.

United States v. Qaoud, 777 F.2d 1105, 1111 (6th Cir. 1985).  In Qaoud, this

Court found that evidence that a judge did not accept a bribe on another occasion

"demonstrate[d] little or nothing about [his] intent on the charges made in this

indictment."  777 F.2d at 1111; see also United States v. Benedetto, 571 F.2d

1246, 1250 (2d Cir. 1978) (recognizing that "defense improperly attempted to

establish defendant's good character by reference to specific good acts" in a

bribery case).  Similarly, in Daulton, this Court found that "evidence of

50

noncriminal conduct to negate the inference of criminal conduct is generally

irrelevant." 2008 WL 116356 at *4 (quoting United States v. Dobbs, 506 F.2d

445, 447 (5th Cir. 1975)); see also United States v. Scarpa, 897 F.2d 63, 70 (2d

Cir. 1990) ("[a] defendant may not seek to establish his innocence . . . through

proof of the absence of criminal acts on [other] specific occasions"); Herzog v.

United States, 226 F.2d 561, 565 (9th Cir. 1955) ("A defendant cannot establish

his innocence of crime by showing that he did not commit similar crimes on other

occasions").

In Daulton, a defendant charged with preparing false tax returns "sought to

introduce testimony from seven clients whose tax returns he prepared without

false deductions." 2008 WL 116356 at *4. In upholding the exclusion of that

evidence, this Court recognized that "[t]he government did not contend that the

defendant always engaged in criminal activity when preparing tax returns." Id.

Hence, this Court concluded that "the proffered evidence of instances when

Daulton prepared truthful returns is irrelevant to the charged instances." Id.; see

also United States v. Ellisor, 522 F.3d 1255, 1270 (11th Cir. 2008) ("[t]he fact that

[defendant] purportedly produced other shows [without absconding with the

money] does not bear on his intent to defraud with respect to the Christmas show

[where he absconded with the money], and is therefore irrelevant").

51

Likewise, evidence that Dimora assisted people who did not provide things of value had no bearing on his intent to defraud and accept bribes on occasions charged in the indictment. Russo testified about the importance of being selective about accepting bribes, stating that he "would never hire two or three people together and have them give me money. I would only get money from one of them," (R. 1039: Russo, Trial Tr., PageID 29093; see also R. 1040: Russo, Trial Tr., PageID 29158-59), and that only a friend of his or Dimora's or a friend or relative of their core "group" could be a sponsor. (R. 1039: Russo, Trial Tr., PageID 28887). Russo was careful about not accepting bribes from someone who was not "safe to work with," where there was no "intermediary person in between" as a "buffer." (Id., PageID 29092). Thus, the court correctly excluded as irrelevant testimony that Dimora assisted others who did not pay bribes, as Dimora's other acts do not disprove his dishonest acts.

In discussing the propriety of reverse 404(b) evidence, the court cited Daulton, recognizing that such evidence "may be probative . . . , [however,] where a defendant is alleged to have 'always' or 'continuously' committed the alleged acts." (R. 602: Order, PageID 12713). But, as the district court correctly recognized, the government did not "allege[] that Dimora *always* engaged in corrupt and fraudulent behavior." (Id., PageID 12174 (emphasis in original)).

52

Instead, the government proved that bribery influenced Dimora's official acts on charged occasions.  Further, none of the trial examples Dimora cites demonstrated a ceaseless criminal conduct theory:

1)  Eliciting testimony from Russo that regular sponsors "received personal attention [from Dimora and Russo] on anything that came up," (R. 1039: Russo, Trial Tr., PageID 28901), referred to Dimora accepting meals from particular people in return for his influence, as Russo earlier identified the "four basic" sponsors between 2002 through May 23, 2008, as co-conspirators Kelley, Pumper, Rybak and Michael Forlani.  (Id., PageID 28897).  Presenting evidence that Dimora helped others who did not provide him meals, therefore, would be irrelevant to instances where he assisted meal sponsors.

2)  The government's closing argument that, when speaking to County employee, Tracey Nichols, about the Coe Lake grant application, Dimora did not ask about other grant applications, (R. 1045: Trial Tr., PageID 30169), referred to Dimora's statements during a single phone call.  In fact, in rebuttal, the prosecutor clarified the argument "referr[ed] specifically to one particular phone call. . . . I'm not talking about any other phone call Commissioner Dimora may or may not have made or any other discussion that Tracey Nichols may have had about other projects, but that particular phone call that Commissioner Dimora made to Tracey

53

Nichols." (R. 1046: Trial Tr., PageID 30476). Evidence about other calls Dimora made, therefore, would not negate evidence about that specific call to Nichols. Further, Dimora declined a curative instruction about the argument. (Id., PageID 30420-25, 30582-83, 30586).

3) The government's argument about Dimora calling Smock about a bid by Kleem, "who, by the way, is the person who's paying for the Bare Pool, who's financing that trip to Las Vegas," in contending the call was not a "coincidence," (R. 1045: Trial Tr., PageID 30136), was a fair comment on testimony about a scheme involving Kleem bribing Dimora with the Las Vegas trip, (R. 1012: Massie, Trial Tr., PageID 22955-56; R. 1013: Trial Tr., PageID 23223-24; R. 1014: Kleem, Trial Tr., PageID 23376-81, 23408-13, 23418-24; R. 1022: Kelley, Trial Tr., PageID 25408-09, 25422-25; R. 1039: Russo, Trial Tr., PageID 29059-62), and evidence of Dimora's intent. Indeed, Dimora lied twice when calling Smock from Las Vegas, claiming that "he just bumped into Ferris Kleem," (R. 1012: Massie, Trial Tr., PageID 22955-56 (discussing Gov't Ex. 400-FF), and feigning ignorance about the second bidder's identity. (Id., PageID 22939 (discussing Gov't Ex. 400-CC)).

4) The government's argument that "[t]he more you gave [Dimora], the more open he was to what you wanted," (R. 1045: Trial Tr., PageID 30223), also

54

was a fair comment on the evidence.  In the immediately preceding sentence, the prosecutor stated: "And remember what Kelley said about the topic," (id.), referring to Kelley's testimony about attempting to obtain a key to the Stonebridge condo, (R. 1024: Kelley, PageID 25804-18), after Dimora requested it for a "Saturday night adventure." (Id., PageID 25799).  Specifically, when asked about his continued efforts to obtain the key despite Dimora saying not to worry about it, Kelley testified: "[a]s Mr. Dimora needed stuff and you were able to get stuff, . . . he became more open to your suggestions and ideas and needs at the [C]ounty level.  So when he says, 'Don't worry about it,' that means worry about it and get it done. That's how I interpreted that." (Id., PageID 25820).  Kelley's testimony referred to his personal experience with Dimora.  It also corroborated Gallagher's testimony that, after giving Dimora the Mohammad bribe, Dimora acknowledged Gallagher at events "much more readily." (R. 1017: Gallagher, Trial Tr., PageID 24303).  Testimony about Dimora's dealings with other people, therefore, was irrelevant to Kelley's and Gallagher's testimony about Dimora's responses to bribes.

Indeed, given the government's focus on specific instances of bribery and fraud, the court correctly concluded that "evidence that Dimora did not on other occasions receive a personal benefit for performing his official actions, or that he

55

properly awarded a [C]ounty contract to the lowest bidder in accordance with

[C]ounty policies . . . , would not negate allegations that he acted corruptly on

those occasions set forth in the Indictment." (R. 602: Order, PageID 12715-16).

Dimora's reliance on a footnote in the court's opinion recognizing, under <u>United</u>

<u>States v. Hayes</u>, 219 Fed. Appx. 114 (3d Cir. 2007) (unpublished), that evidence

of "policies or training Dimora promoted as County Commissioner[] might be

relevant to negate the government's theory of the case," does not establish that the

court erred by excluding "specific instances of lawfulness" as irrelevant.  (<u>Id.</u>,

PageID 12716).  In <u>Hayes</u>, the excluded evidence, "if accepted by the jury, could

well have raised a reasonable doubt about whether Hayes was part of the charged

conspiracy."  219 Fed. Appx. at 117.  Like <u>Daulton</u>, "[w]e do not have the same

case here."  2008 WL 116356 at *5.  For instance, in <u>Daulton</u>, this Court

recognized that, even if the trial court "considered and believed" evidence that

Daulton prepared non-fraudulent tax returns "on occasions other than those

charged," "it would have proved only that Daulton did not always include false

deductions on his clients' tax returns."  <u>Id.</u>  Similarly, evidence that, on different

occasions than those charged, Dimora assisted people who did not pay bribes only

would have established that Dimora did not always solicit or accept bribes in

56

return for his influence, which the court found in excluding the evidence. The evidence, therefore, was irrelevant to the charged offenses.

Additionally, Fed. R. Evid. 405 forbids proof of good character through evidence of specific acts where character is not an element of the charge or defense. United States v. Silber, 2012 WL 171397, *3 (6th Cir. 2012) (unpublished) ("'a federal inspector charged with accepting a bribe from a meat packer can call a character witness to show his reputation for being honest, but he may not call other meat packers to testify that he did not solicit bribes from them.'" (emphasis added) (quoting 1 Kenneth S. Broun et al., McCormick on Evidence § 191)). Like Fed. R. Evid. 403, Rule 405 is intended to prevent the series of wasteful "mini-trials" which would inevitably ensue if the defendant were allowed to pursue this irrelevant line of inquiry. Clark, 2010 WL 1924710 at *8 (recognizing that, "all types of character evidence, evidence of specific instances of conduct 'posses[s] the greatest capacity to arouse prejudice, to confuse, to surprise, and to consume time,' Fed. R. Evid. 405 advisory committee's note").

Moreover, "when there is overwhelming evidence of defendant's guilt, exclusion of reverse Rule 404(b) evidence is harmless." Daulton, 2008 WL 116356 at *5. Because evidence of other occasions where Dimora assisted people who did not provide bribes would not outweigh the overwhelming evidence about

57

the charged instances where Dimora engaged in fraud and accepted bribes in

return for his influence, any error in excluding the evidence was harmless.

58

## III.   THE JURY INSTRUCTIONS CORRECTLY REFLECTED APPLICABLE LAW.

### A.   Standard of Review

This Court reviews challenges to jury instructions for abuse of discretion. United States v. Williams, 612 F.3d 500, 506 (6th Cir. 2010) (citing United States v. Russell, 595 F.3d 633, 642 (6th Cir. 2010)).  This Court "review[s] the instructions as a whole, in order to determine whether they adequately informed the jury of the relevant considerations and provided a basis in law for aiding the jury in reaching its decision."  United States v. Frederick, 406 F.3d 754, 761 (6th Cir. 2005).  "A judgment may be reversed based upon an improper jury instruction only if the instructions, viewed as a whole, were confusing, misleading, or prejudicial."  United States v. Kuehne, 547 F.3d 667, 679 (6th Cir. 2008) (internal quotation marks and citation omitted).

### B.   Argument

Dimora claims the court erred by declining to instruct the jury using his requested language about *quid pro quo* agreements and official acts.  "The refusal of a district court to use language requested by a party is not error 'if the instruction as given is accurate and sufficient.'"  United States v. Mack, 159 F.3d 208, 218 (6th Cir. 1998) (quoting United States v. Horton, 847 F.2d 313, 322 (6th

59

Cir. 1988)). Dimora cannot meet this burden since the court's instructions

correctly reflected applicable law.

    1. *Quid Pro Quo* Instructions

The Dimora trial judge also presided over the trial in <u>United States v. Terry</u>,

707 F.3d 607 (6th Cir. 2013). In <u>Terry</u>, this Court upheld the district court's

nearly identical *quid pro quo* instructions, concluding that they "matched the

definition of bribery." <u>Id.</u> at 614. Indeed, in both cases, the district court

instructed that *quid pro quo* exists if the defendant "agreed to accept a thing of

value in exchange for official action." <u>Compare</u> <u>id.</u> (internal quotation marks

omitted), <u>with</u> R. 1044: Trial Tr., PageID 30004. The court also instructed both

juries that intent "could be based on [defendant's] words, conduct, acts, and all the

surrounding circumstances disclosed by the evidence and the rational or logical

inferences that may be drawn from them." <u>Id.</u>

In both cases the court specified that payments need not be tied to a specific

official act if the defendant "understood that whenever the opportunity presented

itself, [he] would take specific official action on the giver's behalf." <u>Compare</u>

<u>Terry</u>, 707 F.3d at 614 (internal quotation marks and brackets omitted), <u>with</u> R.

1044: Trial Tr., PageID 30004-05; <u>accord</u> <u>United States v. Abbey</u>, 560 F.3d 513,

518 (6th Cir. 2009) (when the illegal gift is given to the official, "it is sufficient if

60

the public official understood that he or she was expected to exercise some influence on the payor's behalf as opportunities arose"); United States v. Whitfield, 590 F.3d 325, 350 (4th Cir. 2009) (quoting with favor United States v. Jennings, 160 F.3d 1006, 1013-14 (4th Cir. 1998)).  Like Terry, under these instructions, "[t]he jury needed to find that [Dimora] agreed to accept things of value in exchange for official acts."  Terry, 707 F.3d at 614.  The district court therefore, correctly provided instructions nearly identical to those in Terry.

The court's instruction that, if the defendant received "a thing of value in exchange for the performance of official action, then it makes no difference that the public official may also have had another lawful motive for soliciting or receiving the thing of value," (R. 1044: Trial Tr., PageID 30007), correctly reflected the well-settled rule that a defendant may be convicted if he had a mixed motive in participating in or committing an act, illegal in part and legal in part. United States v. Woodward, 149 F.3d 46, 71 (1st Cir. 1998) (finding deprivation of honest services if defendant "is found to have intended both a lawful and an unlawful purpose to some degree" (internal quotation marks and citations omitted)); Anderson v. United States, 417 U.S. 211, 226 (1974) ("A single conspiracy may have several purposes, but if one of them--whether primary or

61

secondary--be the violation of a federal law, the conspiracy is unlawful under federal law"); United States v. Biaggi, 909 F.2d 662, 683 (2d Cir. 1990).

Even United States v. Sawyer, 85 F.3d 713 (1st Cir. 1996), on which Dimora relies, recognized that a jury may convict a defendant of "theft of honest services or the bribery predicate of the Travel Act" "if instead or in addition [to business or political friendship], there is an intent to cause the recipient to alter her official acts." Id. at 741.  Accordingly, a "dual motive" jury instruction that a person commits extortion under color of official right when that person possesses a partly corrupt intent and a partly neutral intent, "such as friendship" (id.), is not error.  United States v. Coyne, 4 F.3d 100, 113 (2d Cir. 1993) (upholding jury instruction on bribery and extortion counts that: "defendant accepted or solicited the thing of value, at least in part, for or because of his conduct or intending to be influenced in connection with any business or transaction of [the] County," given defendant's argument he was motivated by friendship).  Further, under the instruction given, Dimora could argue he acted solely because of friendship.

Unlike United States v. Garcia, 992 F.2d 409 (6th Cir. 1993), where the court gave three disjunctive bases for conviction with only one satisfying the *quid pro quo* requirement, here, the court correctly instructed the jury that, if the things of value Dimora accepted were intended to influence an official act, then the

62

statute was violated, even if the things of value also were friendship-based. (R. 1044: Trial Tr., PageID 30007). Stated differently, to convict, the jury was required to find an improper motive, thus, satisfying the intent to influence standard.

2. Rejection of Dimora's Requested Instructions

"[A] district court's refusal to deliver a requested instruction is reversible only if that instruction is '(1) a correct statement of the law, (2) not substantially covered by the charge actually delivered to the jury, and (3) concerns a point so important in the trial that the failure to give it substantially impairs the defendant's defense.'" Mack, 159 F.3d at 218 (quoting United States v. Williams, 952 F.2d 1504, 1512 (6th Cir. 1991)).

a. Friendship

Dimora's complaint that the court did not specify types of friendship, including business and political relationships, when instructing that "property given with the sole motive of cultivating friendship is not a bribe," (R. 1044: Trial Tr., PageID 30007), does not satisfy any prong of the three-part reversal standard. "A district court need not define familiar English words when the jury can appreciate their meaning without special knowledge." Mack, 159 F.3d at 218. Further, nothing prevented Dimora from arguing, based on the court's instruction,

63

that *quid pro quo* did not exist because the givers were motivated <u>solely</u> by some

form of friendship.

b.  Generalized Goodwill

The court's instruction that bribery does not include attempt to buy

"generalized goodwill from a public official who either has been, is, or may be at

some unknown, unspecified later time, in a position to act favorably on the giver's

interests," (R. 1044: Trial Tr., PageID 30005-06), sufficiently encompassed

Dimora's proposed instruction that "[t]he generalized hope or expectation of

ultimate benefit on the part of the giver does not constitute a bribe."  (R. 665:

Proposed Supp. Jury Instructions, PageID 13706).  "[D]efendants [a]re not entitled

to have the instruction given in the precise words they reques[t]."  <u>United States v.

Jones</u>, 647 F.2d 696, 700 (6th Cir. 1981).  Additionally, the court's instruction

distinguished between attempts to obtain an official's goodwill and an official

accepting "a bribe as part of a generalized agreement to improperly exert his

official influence on the payor's behalf."  <u>Abbey</u>, 560 F.3d at 519.  In fact, the

court's instruction permitted Dimora to argue repeatedly during closing that

generalized goodwill or hope of a favor is not a bribe.  (R. 1045: Trial Tr.,

PageID 30275, 30382-84, 30386).

64

Dimora's argument that the scope of the court's goodwill instruction led to misstatements about the law during closing arguments is meritless. The government's arguments that Dimora's acts were not mere coincidence but tied to things of value he received, referred to the government's burden of proving "the payments were made in connection with an agreement, which is to say 'in return for' official acts under it," a requirement Terry recognized. 707 F.3d at 613.

Further, Dimora's claim that one misstatement of law occurred when the government argued "that one phone call conclusively established that a dinner Kelley paid for was a bribe," (Dimora's Br., p. 48 (emphasis added)), simply is wrong. The government argued that the connection between the bribes and official acts "comes in lots of places," (R. 1045: Trial Tr., PageID 30153), with the calls constituting "[t]he third piece of evidence." (Id., PageID 30154 (emphasis added)). In fact, the government described a call where Kelley reminded Dimora about the $250,000 for AA that was on Dimora's agenda the next day, the two laughed about Dimora not wanting to know what Kelley was receiving, followed by Kelley saying, "Speaking of which, Vegas." (Id., PageID 30154-55 (referencing Gov't Ex. 210)). Russo and Schuman also testified about the AA bribes. (R. 1039: Russo, Trial Tr., PageID 29048-50; R. 1016: Schuman, Trial Tr., PageID 24046-47, 24052-62, 24093-94). Simply put, the call about the upcoming

65

Delmonico's dinner, costing AA approximately $800, was not the only evidence

that Dimora accepted bribes from AA, via Kelley, in exchange for his influence.

Thus, the record belies Dimora's claim.

### c. Official Acts

Without citing this Court's precedential decisions in Terry or Abbey,

Dimora challenges the district court's official acts instructions based on cases

from other circuits involving different crimes.  The district court's instruction that

official acts include "the exercise of both formal official influence, such as a

public official's votes, and informal official influence, such as a public official's

influence on other public officials," (R. 1044: Trial Tr., PageID 30008), correctly

reflected Abbey's conclusion that, when an official receives a thing of value, "it is

sufficient if the public official understood that he or she was expected to exercise

some influence on the payor's behalf as opportunities arose."  560 F.3d at 518

(emphasis added).  Abbey specifically rejected applying in Hobbs Act and 18

U.S.C. § 666 cases, the "heightened *quid pro quo* standard" in United States v.

Sun-Diamond Growers of California, 526 U.S. 398 (1999), for gratuity cases

under 18 U.S.C. § 201(c)(1)(A).  Id. at 521.  As Abbey explained, "neither § 666

nor the Hobbs Act contains the 'official act' language that the Sun-Diamond Court

found pregnant with the requirement that some particular official act be identified

66

and proved." Id. (internal quotation marks omitted).  Accordingly, United States

v. Muntain, 610 F.2d 964, 969 (D.C. Cir. 1979), concerning an official directing

subordinate employees to assist givers on matters that could not be brought before

the official by law, also does not apply, as it involved Section 201 gratuity

offenses.  United States v. McNair, 605 F.3d 1152, 1191 (11th Cir. 2010)

(explaining that Section 666 "sweeps more broadly" than Section 201(b) and (c)'s

bribery and gratuity provisions because "Section 666 requires only that money be

given with intent to influence or reward a government agent 'in connection with

any business, transaction or series of transactions,'" not "in return for" or "because

of" "any official act," which are the relevant Section 201 terms).  Indeed, while a

specific official act will suffice in Section 666 and Hobbs Act cases, under Abbey,

the government need only prove an agreement to use official influence in the

giver's favor when needed.

Dimora's reliance on an honest service case also is misplaced.  Unlike

United States v. Urciuoli, 513 F.3d 290 (1st Cir. 2008), the district court did not

give the "cloak of office" instruction that Urciuoli found improperly permitted the

jury to conclude that a state legislator's correspondence to local mayors, using his

title and letterhead, in advocating for an undisclosed employer constituted

deprivation of honest services.  Id. at 294-95, 297.  Regardless, while recognizing

67

that the honest services fraud statute includes "formal official action like votes . . .

[,] informal exercise of influence on bills by a legislator . . . and influence-buying

short of formal bribes, id. at 294, Urciuoli significantly did not decide whether

exerting influence on a briber's behalf constitutes an official act or demonstrates

the official's understanding that he was expected to exercise his official influence

in return for accepting a thing of value under the Hobbs Act (as permitted by

Abbey), as Urciuoli was not charged under that statute.

Additionally, it is well-settled that even if a defendant does not have the

actual power to do the official act he promises to do, if the briber reasonably

expects the defendant possesses the power, a Hobbs Act charge is legally

sufficient.  United States v. Collins, 78 F.3d 1021, 1032 (6th Cir. 1996) ("it is not

necessary that the public official have final authority or control"); United States v.

Carter, 530 F.3d 565, 574 (7th Cir. 2008) (collecting cases); United States v.

Rivera Rangel, 396 F.3d 476, 484-85 (1st Cir. 2005) (executive assistant to the

governor who used her position to help four contractors gain access to government

officials and obtain expedited treatment of their government business possessed

power to facilitate the contractor's business "and it was that power [the contractor]

paid her to exercise"); United States v. Farley, 2 F.3d 645, 651 n.3 (6th Cir. 1993)

(sale of honorary deputy sheriff commissions (citing United States v. Bibby, 752

68

F.2d 1116, 1127 (6th Cir. 1985)); <u>United States v. Stephens</u>, 964 F.2d 424, 429-30

(5th Cir. 1992) (bail bondsman and town alderman (collecting cases)); <u>United</u>

<u>States v. Nedza</u>, 880 F.2d 896, 902 (7th Cir. 1989) (victim reasonably believed

state senator had the ability to influence a local business); <u>United States v.</u>

<u>Harding</u>, 563 F.2d 299, 306-07 (6th Cir. 1977) (collecting cases).

Even <u>United States v. Rabbitt</u>, 583 F.2d 1014 (8th Cir. 1978), a case cited

by Dimora, recognized that "[t]he official need not control the function in question

if the extorted party possesses a reasonable belief in the official's powers." <u>Id.</u> at

1027.  Although a Hobbs Act case, <u>Rabbitt</u>, did not decide, as here, whether a

public official commits an official act by using his influence to contact another

public official on a briber's behalf when the second official receives funding from

the defendant's public office.  In fact, in a later case, involving a defendant county

commissioner, the Eighth Circuit recognized that "[a]ctual authority over the end

result . . . is not controlling if [defendant], through his official position, had

influence and authority over a means to that end." <u>United States v. Loftus</u>, 992

F.2d 793, 796 (8th Cir. 1993).  Moreover, the Seventh Circuit has recognized that

"[t]he fact that the defendant did not control the award of contracts should not be

decisive if his position as a state legislator gives his recommendations a weight

independent of their intrinsic merit." <u>United States v. Holzer</u>, 816 F.2d 304, 309

69

(7th Cir.) (discussing <u>Rabbit</u>), <u>vacated and remanded</u>, 484 U.S. 807 (1978), in

light of <u>McNally v. United States</u>, 483 U.S. 350 (1987). Thus, Dimora's attempt

to tie official action strictly to decision making authority under <u>Rabbitt</u>, is wrong.

Indeed, Dimora's proposed instructions that official acts do not include: (1)

introducing a giver to a decision maker when the official is not a decision maker;

and (2) directing subordinates to assist givers on a matter that could be brought

before the official by law, conflicted with established law. <u>United States v.</u>

<u>Birdsall</u>, 233 U.S. 223, 230 (1914), recognized that official action may be shown

by settled practice and established usage. <u>Accord</u> <u>United States v. Freeman</u>, 6

F.3d 586, 593 (9th Cir. 1993) ("[T]he Hobbs Act reaches anyone who actually

exercises official powers, regardless of whether those powers were conferred by

election, appointment, or some other method"); <u>United States v. Morlang</u>, 531

F.2d 183, 192 (4th Cir. 1975); <u>Biaggi</u>, 853 F.2d at 97. In fact, in a very recent

bribery case under Section 201(b), the Fourth Circuit upheld a settled practice

instruction in concluding that a Congressman engaged in official action by

brokering and promoting business deals in Africa for bribe payers, even though

the business deals were not pending before Congress. <u>United States v. Jefferson</u>,

674 F.3d 332, 351-58 (4th Cir.) (recognizing the distinction between bribery and

illegal gratuity cases and rejecting defendant's claim that <u>Sun-Diamond</u>

70

supersedes <u>Birdsall</u> concerning the bribery statute's definition of official acts),

<u>cert. denied</u>, 133 S. Ct. 648 (2012).  In sum, in light of <u>Birdsall's</u> inclusion of

settled practice and established usage as an official act, the instructions properly

encompassed Dimora exercising his official influence on the briber's behalf by

directing his staff to complete tasks that fell within their normal duties, which

furthered the briber's interest.  Thus, the court's instructions accurately

summarized the law on official acts.

**IV.  SUFFICIENT EVIDENCE SUPPORTS DIMORA'S CONVICTIONS ON COUNTS 9 AND 11-13 FOR HOBBS ACT CONSPIRACY, SUBSTANTIVE HOBBS ACT OFFENSES AND CONSPIRACY TO COMMIT MAIL FRAUD AND HONEST SERVICES MAIL FRAUD.**

**A.    Standard of Review**

Although this Court reviews sufficiency of the evidence claims *de novo*, United States v. Graham, 622 F.3d 445, 448 (6th Cir. 2010), "a defendant claiming insufficiency of the evidence bears a very heavy burden."  United States v. Abboud, 438 F.3d 554, 589 (6th Cir. 2006).  There is "a strong presumption in favor of sustaining a jury conviction."  United States v. Peters, 15 F.3d 540, 544 (6th Cir. 1994).  The test is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1979).

Both circumstantial and direct evidence must be viewed in a light most favorable to the government.  United States v. Humphrey, 279 F.3d 372, 378 (6th Cir. 2002).  Circumstantial evidence alone is sufficient to support a conviction. United States v. Blackwell, 459 F.3d 739, 760 (6th Cir. 2006); United States v. Prince, 214 F.3d 740, 746 (6th Cir. 2000).

72

Since the government prevailed below, it must be given the benefit of all reasonable inferences from the testimony. Graham, 622 F.3d at 448; United States v. McAuliffe, 490 F.3d 526, 537 (6th Cir. 2007); United States v. Villarce, 323 F.3d 435, 438 (6th Cir. 2003). An appellate court may not re-weigh the evidence, reconsider the credibility of witnesses or substitute its judgment for that of the jury. Graham, 622 F.3d at 448; United States v. Hughes, 505 F.3d 578, 592 (6th Cir. 2007).

**B.    Argument**

Dimora challenges the sufficiency of the evidence for three schemes charged in four counts.

### 1. Zavarella (Counts 12-13)

Dimora argues the evidence is insufficient to sustain his convictions concerning the Zavarella scheme because Zavarella described a "generalized hope or expectation of ultimate benefit." (Dimora's Br., p. 54). "[T]o sustain a conviction [under the Hobbs Act], the 'Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts.'" Abbey, 560 F.3d at 517 (quoting Evans v. United States, 504 U.S. 255 (1992)) (footnoted omitted). No specific official action need be identified when the briber makes payment. Instead, when

73

the illegal gift is given to the official, "it is sufficient if the public official understood that he or she was expected to exercise some influence on the payor's behalf <u>as opportunities arose</u>." <u>Id.</u> at 518 (emphasis added); <u>Terry</u>, 707 F.3d at 612. "This sort of 'I'll scratch your back if you scratch mine' arrangement," by paying to retain an officials' services "on an 'as needed' basis" constitutes bribery because the payor made payments intending to exchange them for specific official action." <u>Whitfield</u>, 590 F.3d at 350 (quoting with favor <u>Jennings</u>, 160 F.3d at 1013-14).

The evidence established that Zavarella did exactly that when ZBC provided Dimora free construction work between 2002 and 2008, (R. 1036: Zavarella, Trial Tr., PageID 28300-09), intending that Dimora would exercise his influence on ZBC's and Zavarella's behalves when needed. Zavarella testified that Dimora "was a friend and <u>a political official</u>, and <u>I figured if I could help him, I'm sure he could help me</u>." (R. 1037: Zavarella Trial Tr., PageID 28331 (emphasis added)). When ZBC first installed masonry at Dimora's residence, Dimora already had assisted Zavarella's daughter with County employment, which demonstrated Zavarella's knowledge about Dimora's influence and expectation about Dimora's assistance. (<u>Id.</u>).

74

Specifically, after providing Dimora free construction work, Zavarella asked for Dimora's return assistance in obtaining two teaching positions for Zavarella's daughter between 2005 and 2007.  (Id., PageID 28331-34).  When Zavarella asked Dimora to help find County employment for Zavarella's neighbor, Trovato, in summer 2007, Dimora recommended Trovato for a position with Russo, which Trovato received.  (Id., PageID 28335; R. 1039: Russo, Trial Tr., PageID 29078). At Zavarella's request, Dimora also inquired about a County project for which ZBC would serve as a subcontractor.  (R. 1037: Zavarella, Trial Tr., PageID 28335-38).  Beyond these acts, Dimora manifested his understanding that the home improvements ZBC provided were in exchange for Dimora's influence by not requesting estimates or offering to pay for the work when it was conducted.

Dimora's suggestion that Zavarella acted solely because of friendship is not supported by the evidence, as Zavarella's testimony that Dimora was a friend, (id., PageID 28331), did not demonstrate that friendship alone motivated Zavarella to provide Dimora free construction work.  Anderson, 417 U.S. at 226; Woodward, 149 F.3d at 71.  In fact, Zaverella testified that he did not provide the same quantity of free work to friends and family as he did Dimora, (id., PageID 28330-31), and that Zavarella's other friends offered to pay for his work.  (R. 1036: Zavarella, Trial Tr., PageID 28310).

75

As the district court recognized, "if the gifts were truly given out of friendship, there would have been no reason for Dimora to attempt to make partial payments years after the free work was performed," (R. 930: Opinion, PageID 18888-89 n.9), and only after the investigation began.  Indeed, Dimora said he needed an invoice from Zavarella, not because Dimora felt bad that a friend paid over $25,000 for Dimora's home improvements, (R. 1036: Zavarella, Trial Tr., PageID 28302, 28305-09), but because something came up and Dimora did not want Zavarella involved.  (R. 1036: Zavarella, Trial Tr., PageID 28310).  Dimora also sent ZBC a check before receiving ZBC's invoice, which grossly understated the work's value.  (Id., PageID 28302, 28305, 28311-12, 28315-16; R. 1039: Oliver, Trial Tr., PageID 28645-46; R. 1042: Fatula, Trial Tr., PageID 29648).  These actions showed that Dimora accepted the things of value knowing they were not provided because of friendship, but with the expectation that Dimora would use his influence on ZBC's and Zavarella's behalves when needed.  Indeed, "motives and consequences, not formalities, are the keys for determining whether a public official entered an agreement to accept a bribe, and the trier of fact is quite capable of deciding the intent with which words were spoken or actions taken as well as the reasonable construction given to them by the official

76

and the payor," <u>Terry</u>, 707 F.3d at 613 (internal brackets and quotation marks omitted), as the jury did here.

    2.  <u>Valentin (Count 11)</u>

Similar to Zavarella, Valentin testified that he provided Dimora free granite because "if I need some help from him I can get some favors." (R. 1036: Valentin, Trial Tr., PageID 28226). Valentin also testified that he "considered it like a favor that I did to him in expecting in the future some favors from him, too," (<u>id.</u>, PageID 28233; <u>see also</u> <u>id.</u>, PageID 28242), echoing <u>Jennings'</u> "I'll scratch your back" language.

The future favor arose when Dimora offered to help Valentin's friends, Valeriu and Elizabeta Popute, obtain visas to travel to the United States. (R. 1036: Valentin, Trial Tr., PageID 28243-45). Valentin subsequently received copies of two letters that Senator George Voinovich sent to the U.S. Embassy in Bucharest, Romania, about the Poputes' nonimmigrant visa applications. (<u>Id.</u>). The letters reflected that Dimora contacted Senator Voinovich in his official capacity as "Jimmy Dimora, Cuyahoga County [C]ommissioner." (R. 1038: Oliver, Trial Tr., PageID 28619-20). Additionally, at Dimora's request, Russo met with Senator Voinovich's chief of staff, Andy Futey, explaining: "Jimmy really wants this done bad. So do I. It would be a big favor to us. I hope you can accommodate us." (R.

1039: Russo, Trial Tr., PageID 29040-41).  As the district court recognized, "Dimora's efforts to assist Valentin in this matter corroborate Valentin's understanding of their 'mutual relationship' as one where Dimora's official services were retained on an 'as needed' basis."  (R. 930: Opinion, PageID 18886).

Dimora's emphasis on whether the correspondence constituted an official act is misplaced.  "[F]ulfillment of the *quid pro quo* is not an element of the [Hobbs Act] offense."  Abbey, 560 F.3d at 517 (quoting Evans, 504 U.S. at 255).  Instead, the issue is whether the correspondence demonstrated Dimora's understanding that he was "was expected to exercise some influence on the payor's behalf as opportunities arose," id. at 518, which Dimora's use of his official title when contacting a U.S. Senator on Valentin's behalf establishes.  Cf. Jefferson, 674 F.3d at 332 (concluding that Congressman Jefferson engaged in official action by brokering and promoting business deals in Africa for bribe payers, even though the business deals were not pending before Congress).

Further, Urciuoli, 513 F.3d at 290, an honest services case, did not determine whether using one's official title in contacting a U.S. Senator on the briber's behalf demonstrates an official's understanding that he was expected to exercise his influence in return for accepting a thing of value under the Hobbs Act.  Regardless, Dimora demonstrated his understanding by voting about a matter

concerning Valentin's daughter which, as the government argued during closing, constituted an official act. (R. 1045: Trial Tr., PageID 30189). Specifically, Russo testified that, over vigorous objection by the County Treasurer, Dimora approved funds for the Auditor's Office to start a foreclosure board intended to employ Valentin's daughter. (R. 1039: Russo, Trial Tr., PageID 29036-38; R. 1040: Russo, Trial Tr., PageID 29118-19). Dimora's argument challenging the official act evidence, therefore, is without merit.

### 3. Coppers (Count 9)

The evidence sufficiently established that Dimora conspired to commit mail fraud and honest services mail fraud when helping Coppers obtain employment with Bedford Municipal Court. While Dimora claims on appeal that he was having an affair with Coppers, pen register evidence showed no telephone calls between the two from fall 2007 until March 14, 2008. (R. 1010: Massie, Trial Tr., PageID 22452; R. 1019: Massie, Trial Tr., PageID 24752). During a March 14, 2008 telephone call, Dimora referred to their agreed meeting the next day for sex as "an unexpected pleasure." (Gov't Ex. 901).

The evidence further established that after meeting Coppers at a hotel, Dimora made approximately 70 calls about a job for Coppers. (R. 1019: Massie, Trial Tr., PageID 24880). During intercepted calls, Dimora did not tell Tom Day,

79

who made hiring decisions, that Coppers provided Dimora a hotel room valued at

$121 and sexual favors, (id., PageID 24757-62, 24803-08, 24811-12, 24824), in

exchange for Dimora using his authority and influence to secure employment with

Ohio Public Employees Retirement System (OPERS) benefits for Coppers, at a

salary agreeable to her. (Id., PageID 24759-74, 24779-24803, 24807-10, 24818-

19; see also R. 1033: Jaworski, Trial Tr., PageID 27398).

Concealing the bribe demonstrated Dimora's corrupt intent and constituted

a material omission, particularly when combined with Dimora's material false

statements and omissions during intercepted telephone calls. Specifically, Dimora

lied to Day twice on June 2, 2008, when Dimora claimed he had not talked to

Coppers, (id., PageID 24807; Gov't Ex. 924), when, in fact, Dimora had spoken to

Coppers earlier that night about her discussion with Day and Dimora had agreed to

meet Coppers that night. (R. 1019: Massie, Trial Tr., PageID 24808, 24810-17).

During that conversation, Coppers expressed concern to Dimora that the Bedford

position would be temporary and that the Solon position might not be available

immediately. (Id., PageID 24802-03; Gov't Ex. 921).

Dimora also omitted material facts when presenting her as a competent,

good worker, when he knew facts to the contrary. During an intercepted call with

Thomas Flauto, Moreland Hills Police Chief, on March 20, 2008, Flauto told

80

Dimora that Coppers "wants the kind of job where she can do what she wants, you know?" (R. 1019: Massie, Trial Tr., PageID 24769). Dimora replied: "Right. That was when you were in the Bedford Heights, but you ain't gonna get that now." (Id.). This conversation established that Dimora knew Coppers sought a job where she could "do what she want[ed]," (id.), but Dimora never disclosed that to Day.

Similarly, when Dimora and Coppers discussed the timing for her new job and notifying her employer, a private school, Coppers replied, "I could leave them tomorrow. I could leave them high and dry. It would not bother me." (Id., PageID 24879). Coppers's attitude about her then-present employer would be highly pertinent to a hiring entity. Indeed, Bedford might have concluded that one who would leave a school without notice lacks the work ethic and sense of duty the public expects of government employees. Thus, Dimora's material omissions and false statements distinguish his conduct from United States v. Frost, 125 F.3d 346 (6th Cir. 1997), where no evidence suggested the defendant "committed any deception when helping to secure . . . [a] contract, other than not disclosing a conflict of interest" to his employer, NASA. Id. at 360.

Significantly, Dimora, in return for things of value, caused a public entity to create a position for Coppers, at her desired salary, after several conversations

81

about her salary requirements.  (R. 1019: Massie, Trial Tr., PageID 24779-80, 24784-86, 24792).  In fact, on March 21, 2008, Day left a message for Coppers saying there were no available positions, (id., PageID 24771-72; see also id., PageID 24802), and investigators found no evidence Bedford advertised for the position Coppers received.  (Id. PageID 24881).  Nevertheless, while negotiating a position for Coppers during a subsequent call, Day said he would pay Coppers what she needed to make, (id., PageID 24808), and told Dimora "I know she is looking to you . . . I want to do this for you and . . . for her, and . . . the judge does, too . . . we'll get it done."  (Id., PageID 24810).  Day also confirmed with Dimora that Coppers wanted to earn $24,000 per year for a part-time job.  (Id.; Gov't Ex. 924).  In short, Dimora placed Coppers' desires above Bedford's by focusing solely on Copper's desired salary.  In fact, Coppers' predecessor earned substantially less.  (R. 1019: Massie, Trial Tr., PageID 24822-25, 241825).  Dimora's actions, therefore, deprived Bedford of additional money it could have saved by: (1) not hiring Coppers, or (2) hiring Coppers at a lower salary.

Dimora's argument that he did not commit official acts, which only concerns the honest services prong of the dual-object conspiracy, is wrong. Several witnesses testified about Dimora's financial control over County suburbs like Bedford, (R. 1019: Massie, Trial Tr., PageID 24830), including contracts for

82

suburban road construction, (R. 1015: Dever, Trial Tr., PageID 23769, 23773-79),

and sharing 40% of a grant (approximately $1.4 million) with County suburbs. (R.

1034: Oyaski, Trial Tr., PageID 27551). Further, on March 27, 2008, during the

period Dimora engaged in multiple conversations to secure employment for

Coppers in Bedford, Dimora voted to award Bedford a $100,000 grant. (R. 1019:

Massie, Trial Tr., PageID 24847-48). In fact, Bedford received approximately $1

million in discretionary funding from Cuyahoga County. (R. 1029: Gambosi, Trial

Tr., PageID 26913-15).

    Beyond discretionary funds, the County Commissioners voted to release

funds totaling approximately 40% of the salary and benefit expenses for Bedford

judges and the court clerk, Day, the very person Dimora lobbied to hire Coppers.

(Id., PageID 26907-13; R. 1019: Massie, Trial Tr., PageID 24838-40). Thus, the

evidence revealed the control that Dimora had over County suburbs and courts,

including Bedford.

    As the Eighth Circuit recognized, "[a]ctual authority over the end result . . .

is not controlling if [defendant], through his official position, had influence and

authority over a means to that end." Loftus, 992 F.2d at 796. That is particularly

true where Dimora controlled the salary purse strings of the person he lobbied to

hire Coppers for public employment.

83

## **CONCLUSION**

For the foregoing reasons, the United States respectfully requests that this

Court affirm Dimora's convictions.

Eric H. Holder, Jr.
Attorney General of the United States

Barbara L. McQuade
United States Attorney
Eastern District of Michigan


By:    /s/  **Laura McMullen Ford**
Laura McMullen Ford
Antoinette T. Bacon
Ann C. Rowland
Assistant U.S. Attorneys
United States Court House
801 West Superior Avenue, Suite 400
Cleveland, Ohio  44113
Telephone No: (216) 622-3817/3966/3847
Facsimile No: (216) 522-7358/2343
Laura.Ford@usdoj.gov
Antoinette.T.Bacon@usdoj.gov
Ann.Rowland@usdoj.gov

Counsel for Plaintiff-Appellee

84

## **CERTIFICATION OF COMPLIANCE WITH WORD LIMITATION**

I hereby certify that the foregoing contains 16,690 words according to the

word counting feature of WordPerfect X5 and complies with this Court's order

dated April 1, 2013, granting the government an additional 3,200 words for a total

of 17,200 words.


/s/ Laura McMullen Ford
Laura McMullen Ford
Assistant United States Attorney

85

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 3rd day of June 2013, a copy of the foregoing

Brief of Plaintiff-Appellee, was filed electronically.  Notice of this filing will be

sent to all parties by operation of the Court's electronic filing system.  Parties may

access this filing through the Court's system.


/s/  Laura McMullen Ford
Laura McMullen Ford
Assistant United States  Attorney

86

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

Pursuant to Sixth Circuit Rule 30(b), the following filings from the district

court's records are designated as relevant to this appeal:

| DESCRIPTION OF ENTRY | RECORD ENTRY NO. | PAGE ID RANGE |
|---|---|---|
| Docket Sheet, Northern District of Ohio, Case No. 1:10CR387 | N/A | N/A |
| Third Superseding Indictment | 444 | 9630-777 |
| Response | 589 | 12529-37 |
| Opinion | 602 | 12672-749 |
| Proposed Supp. Jury Instructions | 665 | 13705-14 |
| Motion | 681 | 13743-46 |
| Verdict | 738 | 17116-53 |
| Motion | 875 | 18158-84 |
| Opinion | 930 | 18871-916 |
| Financial Disclosure Statement (Ethics Reports) | 940-2 | 19019-225 |
| Judgment | 957 | 19979-87 |
| Notice of Appeal | 967 | 20034 |
| Transcript of Sentencing Held on 7/31/12 | 1000 | 20495-645 |
| Transcript of Trial Held on 1/12/12 | 1010 | 22262-555 |
| Transcript of Trial Held on 1/13/12 | 1012 | 22852-23012 |
| Transcript of Trial Held on 1/17/12 | 1013 | 23013-282 |

87

| DESCRIPTION OF ENTRY | RECORD ENTRY NO. | PAGE ID RANGE |
|---|---|---|
| Transcript of Trial Held on 1/18/12 | 1014 | 23283-529 |
| Transcript of Trial Held on 1/19/12 | 1015 | 23530-851 |
| Transcript of Trial Held on 1/20/12 | 1016 | 23852-130 |
| Transcript of Trial Held on 1/23/12 | 1017 | 24131-354 |
| Transcript of Trial Held on 1/24/12 | 1018 | 24355-654 |
| Transcript of Trial Held on 1/25/12 | 1019 | 24655-921 |
| Transcript of Trial Held on 1/26/12 | 1020 | 24922-25142 |
| Transcript of Trial Held on 1/27/12 | 1021 | 25143-385 |
| Transcript of Trial Held on 1/31/12 | 1022 | 25386-460 |
| Transcript of Trial Held on 1/30/12 | 1024 | 25612-897 |
| Transcript of Trial Held on 2/2/12 (Sealed) | 1026 | 26149-414 |
| Transcript of Trial Held on 2/3/12 | 1027 | 26415-722 |
| Transcript of Trial Held on 2/22/12 | 1029 | 26874-981 |
| Transcript of Trial Held on 2/23/12 | 1030 | 26982-202 |
| Transcript of Trial Held on 2/24/12 | 1031 | 27203-304 |
| Transcript of Trial Held on 2/6/12 | 1033 | 27394-543 |
| Transcript of Trial Held on 2/7/12 | 1034 | 27544-803 |
| Transcript of Trial Held on 2/8/12 | 1035 | 27804-28048 |
| Transcript of Trial Held on 2/9/12 | 1036 | 28049-321 |
| Transcript of Trial Held on 2/10/12 | 1037 | 28322-589 |
| Transcript of Trial Held on 2/1312 | 1038 | 28590-862 |

88

| DESCRIPTION OF ENTRY | RECORD ENTRY NO. | PAGE ID RANGE |
|---|---|---|
| Transcript of Trial Held on 2/14/12 | 1039 | 28863-29097 |
| Transcript of Trial Held on 2/15/12 | 1040 | 29098-369 |
| Transcript of Trial Held on 2/16/12 | 1042 | 29565-719 |
| Transcript of Trial Held on 2/14/12 (Sealed) | 1043 | 29720-957 |
| Transcript of Trial Held on 2/28/12 | 1044 | 29958-30126 |
| Transcript of Trial Held on 2/29/12 | 1045 | 30127-409 |
| Transcript of Trial Held on 3/1/12 | 1046 | 30410-594 |